## UNITED STATES v. FRADKIN.
### No. 51.

Circuit Court of Appeals, Second Circuit.
Dec. 9, 1935.

Osmond K. Fraenkel, of New York City (Osmond K. Fraenkel, John L. Lotsch, William T. Griffin, and James J. Doyle, all of New York City, of counsel), for appellant Fradkin.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith, James G. Soileppi, and Frank J. Parker, Asst. U. S. Attys., all of Brooklyn, N. Y., of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant James J. Fradkin was indicted with five other persons for using, and for conspiring to use, the mails in a scheme to defraud. Together with Julius Lehrenkrauss and Charles F. Lehrenkrauss he was convicted of substantive offenses under fifteen counts of the indictment and was also convicted under the conspiracy count. The defendant Fradkin alone appeals.

In the spring of 1932 Fradkin had several conversations with Julius Lehrenkrauss, who said the partnership of Lehrenkrauss & Sons needed additional working capital. As a result of these conversations it was decided to form the Lehrenkrauss Corporation, and in July, 1932, Fradkin was employed to take charge of the sales of the preferred stock of the new corporation under an agreement whereby he was to receive a compensation of 10% upon sales of that stock. He became sales manager for the Lehrenkrauss interests, opened offices for a sales promotion campaign, engaged a large number of salesmen, and took charge of the sales literature. In the course of his employment he sold 16,110 shares for $1,-611,000. It was principally for participating in a scheme to defraud through the sale of the stock and for the use of the mails in order to carry out the scheme that he was convicted. The appellant does not question the fact that a scheme to defraud existed and that it was effected through the use of the mails, but insists

that he was not a conscious participant in any fraudulent enterprise.

The firm of J. Lehrenkrauss & Sons was an old concern which had for many years done a large business in Brooklyn, N. Y. It owned or controlled various subsidiary corporations, among others J. Lehrenkrauss & Sons, Inc., engaged in life insurance business; Lehrenkrauss Mortgage Title & Guarantee Company, a company for insuring titles and guaranteeing mortgages; Omnis Corporation, a company for ownership of real estate; and Universal Tours, which was a travel agency. After the general depression set in, the Lehrenkrauss enterprises became embarrassed and finally in December, 1933, became bankrupt. The partnership endeavored to stem the tide by new sales of mortgages and mortgage participating certificates. In doing this it resorted to various frauds such as the sale of mortgages and certificates for larger sums than the assessed or market values of the mortgaged properties, guaranties of mortgages as first liens that were not such, and the hypothecation of mortgages against which participation certificates had been issued where the trust assignments had not been recorded. In order to raise still more money from the issue of securities, the Lehrenkrauss Corporation was formed in the summer of 1932. It was represented that this was to be a holding company that would control the Lehrenkrauss enterprises. As a matter of fact it did not exercise such control. It issued its stock to the public, and especially to customers who already held mortgages or participation certificates through exaggerated and fraudulent representations of its real condition. The holders of mortgages and certificates were persuaded to turn them over in exchange for shares of the preferred stock of the Lehrenkrauss Corporation, and they and others were likewise persuaded to purchase this stock for cash. From the sales of the preferred stock the Lehrenkrauss Corporation received cash or its equivalent amounting to $694,-250 and mortgages and certificates amounting to $949,200 subject to certain deductions, making altogether the net sum of $1,611,000 already mentioned. Out of the above mortgages, certificates and cash received by Lehrenkrauss Corporation for its preferred stock, mortgages, certificates, and cash amounting to $929,110 were transferred to the partnership by the corpo-

ration in exchange for notes, approximating that total, drawn by Omnis Corporation to its own order, indorsed by it and thereafter indorsed by J. Lehrenkrauss & Sons. The portion of the receipts from sales of the preferred stock not transferred to the partnership through the mechanism of the Omnis notes was retained by the Lehrenkrauss Corporation for its own operations. By obtaining the mortgages and certificates the partnership was able to realize large sums through their sale or use as collateral for loans, but the Lehrenkrauss Corporation, in return for valuable mortgages and certificates, had only the notes of the Omnis Corporation. These notes were a mere device for effecting the transfer to the Lehrenkrauss partnership of mortgages, certificates, and cash received by the Lehrenkrauss Corporation upon sales of its preferred stock. The transfer benefited the partnership but left the Lehrenkrauss Corporation in an impaired financial condition by substituting for cash and mortgages accommodation notes of Omnis. These notes, indorsed by the Lehrenkrauss firm, were finally exchanged for a single note of $927,100 which lacked the indorsement. The Omnis Corporation was insolvent; its notes were supported by assets so inadequate that the purchasers of the preferred stock of the Lehrenkrauss Corporation incurred great losses through the substitution of those notes for cash and mortgages (Fols. 3089, 3594). This statement is warranted by the testimony of Hammel, by Radert's tabulations and estimates, as well as indicated by the large operating losses for the year 1932 which appear in the balance sheet (Exhibit 145) upon which Fradkin in 1933 sought to obtain a loan for the Lehrenkrauss Corporation from the Reconstruction Finance Corporation.

The government called as a witness Kate Woambach. She was a woman who had bought, in 1933, 1,000 shares of stock of the Lehrenkrauss Corporation and paid therefor $21,000 in cash and $79,000 in mortgages and participation certificates. She said that early in 1933 Fradkin had advised her to purchase the stock and had told her that the company was a "four million dollar corporation, that every organization was incorporated in the Lehrenkrauss Corporation * * *" and that the various Lehrenkrauss enterprises were making profits. The mortgages which she exchanged for the worthless

stock she had owned for years were not in default and had been renewed from time to time. Fradkin assured her that the stock would pay 6 per cent., was perfectly safe, and was safer in every way than the securities she had. Julius Lehrenkrauss was with Fradkin at the interview. Fradkin promised to give the customer a proof sheet showing that the various enterprises were making money, but when asked for it later told her that he could not get hold of it. The consolidated statement of earnings of the Lehrenkrauss enterprises which was used when Fradkin was seeking to obtain a loan from the Reconstruction Finance Corporation showed that during the year 1932 they had operated at a net loss of $179,-454 (Exhibit 145), and in 1931 at a net loss of $66,549.82.

Marie Klatte was another customer who, with her mother, was persuaded by Fradkin to buy $37,600 of the worthless stock of Lehrenkrauss Corporation through assurances that the company was doing a flourishing business.

Mrs. Grau was another customer defrauded by Fradkin. She owned a participation certificate in a first mortgage on Fulton street, Brooklyn, which did not satisfy her. She was introduced by Charles Lehrenkrauss to Fradkin, who gave her extravagant accounts of the earnings of the Lehrenkrauss enterprises, and as a result she exchanged her participation certificate for another in a mortgage on 363 Fulton street, which was encumbered by a prior mortgage of $60,-000.

Fradkin organized the campaign for the sale of the preferred stock of the Lehrenkrauss Corporation, had an office on the third floor of the Lehrenkrauss Building, gave instructions to the salesmen, and was directly responsible for the high-pressure salesmanship which resulted in obtaining cash or property of the approximate value of $1,600,000 for the stock. This was done at a time when the earnings of the Lehrenkrauss enterprises showed in the aggregate substantial losses. Notwithstanding this the purchasers were assured that the stock was a safe investment, that it would pay regular dividends, and two dividends upon it were actually paid. The enterprises were operating at perhaps the most critical time in the history of real estate companies, and there were huge guaranties to meet upon the mortgages that had been sold and bankruptcy was not far off. In the spring of 1932, when Fradkin's association with the Lehrenkrauss enterprises began, he was told by Julius Lehrenkrauss that the firm needed $300,000 because the banks were "harassing" them. He was familiar with the balance sheet of December 31, 1931, and the profit and loss statement of the Lehrenkrauss enterprises covering the last six months of the business of that year. While these on their face showed a net worth on the part of the firm of about $4,000,000, the net earnings for the six months were stated to have been only $47,609.54. Moreover, the consolidated statement of net earnings for the whole year which was submitted by Fradkin to the Reconstruction Finance Corporation showed a substantial loss that greatly increased during 1932. Furthermore, the contingent liability upon about $30,000,000 of guaranteed mortgages was ignored in the December 31, 1931, statement, though it was notorious that at that time the position of guaranteed mortgages was growing worse and before long there was a general inability of such companies to meet their obligations. Upon the initiative of Fradkin, Challis Gore, as so-called "financial sales promotion counsel," prepared literature for use in the sale of Lehrenkrauss Corporation preferred stock. Gore testified that he went through the office with Fradkin, had a talk with him, and, on the basis of the information gained at that time, wrote a booklet. He likewise prepared a "confidential memorandum" for salesmen which stated that the "Lehrenkrauss Corporation preferred shares pay 6 per cent. * * * nearly double the interest being paid today on savings bank deposits. Payment of this 6% preferred dividend, like the payment of mortgage interest, is guaranteed by J. Lehrenkrauss & Sons." It also stated that the preferred shares might be called by the corporation at 105, and in case they were not repurchased at 105 by April 1, 1940, J. Lehrenkrauss & Sons guaranteed to buy them at that price. It further said that if the shares were called in one year the customer would make 11 per cent., if in two years 8½ per cent. per annum, and that the gross income derived by J. Lehrenkrauss & Sons from guaranteeing the outstanding $30,-000,000 of first mortgages was substantially in excess of the dividend requirements on the entire issue of the 6%

investment in preferred stock. When it is remembered that this memorandum was made about the middle of 1932, when the depression was at its worst, the picture presented was plainly most misleading.

■ Hammell, the head bookkeeper and auditor for the partnership, testified that Fradkin instructed him to allow no employee in Hammell's private office "on the third floor of the House of Lehrenkrauss," and said this instruction extended even to Kaiser, who was a special partner in the firm. This evidence, in view of all the circumstances, goes far to show participation by the appellant in a fraudulent scheme. It is unlikely that Fradkin directed the sales policy of the Lehrenkrauss Corporation, placed its preferred stock on the market by means of false and exaggerated representations as to its security, and actively undertook to raise money from the Reconstruction Finance Corporation upon statements which showed that the Lehrenkrauss enterprises were operating at a large loss and at the same time was unaware that the representations had no basis. A man who was directing the sales campaign, employing and discharging the staff, and signing letters as assistant to the president, was too intimately involved in the fraudulent scheme to save the House of Lehrenkrauss to justify his contention that the question whether he knowingly participated in the scheme was not even a proper subject for a jury to consider. It seems evident that he either knew that the representations made to customers were false or was aware that he was making and authorizing reckless representations to be made without knowing whether they were true or false. Either course of conduct would render him a participant in the scheme to defraud. Bentel v. United States (C.C.A.) 13 F.(2d) 327, 329. It is not important that the scheme involved several different operations and methods or that the various participants contributed in different manner or degree to the result, so long as Fradkin was aware that he was engaged in an enterprise, the purpose of which was to save the House of Lehrenkrauss by obtaining property and cash from the public upon exaggerated and false representations and that the enterprise was to be carried out through the use of the mails. We think there was ample evidence to justify a verdict of guilty. Silkworth v. United States (C.C.A.) 10 F.(2d) 711, 717; Van Riper v. United States (C.C.A.) 13 F.(2d) 961, 964; United States v. Baker (C.C.A.) 61 F.(2d) 469, 470.

■■ It is contended that it was error to deny appellant's motion for a severance so that he might have a separate trial. Before the case came on for trial, Julius Lehrenkrauss had pleaded guilty in the state court to a charge of grand larceny. It is argued that Fradkin's rights were prejudiced by having to be tried with a confessed criminal and to be subjected to the risk of having testimony introduced against Lehrenkrauss which, though not competent against Fradkin, would as a matter of fact remain in the minds of the jury. Whether to order a severance was a matter of discretion on the part of the court below, and we cannot say that the discretion was abused. A man takes some risk in choosing his associates and, if he is hailed into court with them, must ordinarily rely on the fairness and ability of the jury to separate the sheep from the goats. Moreover, the trial judge carefully charged the jury that there was no testimony showing that Fradkin knew of the irregularities in respect to the Omnis notes or the releasing of cash and mortgage securities for the benefit of the Lehrenkrauss firm and said to them "if you find he had knowledge you must find it from the surrounding circumstances." We think that Fradkin had all the safeguards necessary to afford a fair trial.

Finally, it is argued that the appellant is entitled to a new trial because of the conduct of the prosecuting officer. This contention has no substantial basis.

Judgment affirmed.