**Alfred H. OSBORNE, Sr., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 20240.**

United States Court of Appeals Ninth Circuit.

Jan. 18, 1967.

Rehearing Denied Feb. 21, 1967.

Morris A. Shenker, Murry L. Randall, John L. Boeger, St. Louis, Mo., Alfred H. Osborne, Kansas City, Mo., for appellant.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Div., Robert L. Brosio, Asst. U. S.

Atty., Asst. Chief, Crim. Div., Jules D. Barnett, Asst. U. S. Atty., Chief, Fraud Sect., Los Angeles, Cal., for appellee.

Gladys Towles Root, Los Angeles, Cal., for appellee, Melnick.

Before BARNES, HAMLIN and BROWNING, Circuit Judges.

BARNES, Circuit Judge.

Appellant was indicted, together with codefendant Sam Melnick, in a twenty count indictment; the first eighteen counts charging violation of 18 U.S.C. § 1343 (fraud by wire);[1] the nineteenth count charging a violation of 18 U.S.C. § 2314 (interstate transportation of monies obtained by fraud);[2] and the twentieth a violation of 18 U.S.C. § 371 (conspiracy to defraud).

At a jury trial, appellant was convicted of substantive counts 5, 6, 16 and 18; and of substantive count 19, and the conspiracy count, 20. After a week of trial, the codefendant Melnick entered a guilty plea to the conspiracy count. Appellant was sentenced to five years on each of the six counts; the sentences on 5, 6 and 16 to run concurrently with each other, and 18, 19 and 20 to run concurrently with each other but consecutively to sentences on 5, 6 and 16.

Jurisdiction below rested on 18 U.S.C. § 3231, and rests here on 28 U.S.C. §§ 1291 and 1294.

The facts are complicated, and difficult to accurately outline. This difficulty is enhanced by inadequate references to the reporter's transcript in the government's brief.[3]

1. "§ 1343. *Fraud by wire, radio or television*

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years or both."

2. "§ 2314. *Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting*

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security, or tax stamps, or any part thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

"This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country."

3. (a) As an example, one of the key issues in this case was which one of the defendants, if not both, obtained the funds allegedly taken by fraud from Estelle Curry ($40,000), Emalyn Rabe ($50,000), Glen Cowan ($3,000), William Rabe ($17,500) and Gladys Mott ($8,500)—a total of $119,000. $25,000 of this was allegedly obtained from Emalyn Rabe to purchase a corporation—American Spacemaster Company. The government brief states:

"Though that was the express specific purpose for obtaining the sum of $25,000, *appellant kept the money and*

I. Sufficiency of the Evidence on Conspiracy Count (Appellant's Specification of Error XI.)

█ It was for this reason necessary for the court to read the entire reporter's transcript. From that reading it seems clear that by a substantial preponderance of evidence, the two named defendants participated in a scheme to defraud certain parties of a great deal of money, and obtained it by means of fraudulent representations.[4] We are entirely satisfied

*never paid it over to anyone.* [R.T. 500–1; 503–8.]" (Appellee's Brief, p. 5. Emphasis added.)

Nowhere between pages 500 to 508 of the Reporter's Transcript is this subject of who got $25,000 mentioned—in fact nowhere is $25,000 mentioned. The government proved that neither witness Meyer nor witness Skaggs had any connection with Leeds Corporation. (R.T. pp. 502, 509.) We are referred to no testimony as to *who* owned Leeds Corporation, or whether *they* received any money. Mr. Skaggs paid defendant Osborne's son $500 for attorney's fees, but this had to do with "Spacemaster," was an investment therein by Skaggs, and had nothing to do with Osborne's "keeping the $25,-000." (R.T. p. 512.)

(b) On the same page 5 of the government's brief, the statement is made:

"Many checks and substantial quantities of cash *as aforesaid* were turned over to codefendant Melnick and appellant, by the individuals listed above, *the major portion of which was received by appellant.* [R.T. 215–218, 231, 235–6, 617–18, 658–61.]" (Emphasis added.)

When we examine the testimony we find:

At R.T. 215–218: Witness *Emalyn Rabe* testified she paid *Osborne* $1,382 and *Melnick* $1,800.

At R.T. 231: Witness E. Rabe testified she gave *Melnick* $5,000 *for* Osborne.

At R.T. 235–6: Witness E. Rabe testified she gave *Melnick* $900, and Osborne *asked* for more.

At R.T. 617–8: Witness Yergin testified "large sums of money" were "always" given to Mr. Melnick, without specifying amounts.

At R.T. 658–61: Witness Yergin testified defendant Osborne would *ask* for more money, and for "large amounts" of money. Miss Rabe would get it at the bank, put it in a manila envelope, and deliver it to Melnick, and that Melnick would deliver the envelope to Osborne, unopened. But *no specific sums* were ever mentioned in this testimony.

The specific sums mentioned prove that Osborne, found guilty of conspiring to defraud with Melnick, asked for money, and asked that monies be delivered to Melnick. But they also prove, specifically,

only that Melnick got $7,700 plus, and that Osborne got $1,382 plus. They do not establish what is claimed; that "the major portion" of what was delivered to Osborne and Melnick *"was received* by appellant." (Emphasis added.)

(c) Again, on the same page 5 of the government's brief the government states:

"Witnesses Webb and Hodges testified that Melnick actually received the $10,-000, that he then gave appellant $5,-000, and that appellant then flew back to Kansas City, Missouri from Los Angeles *with the $5,000.* [R.T. 102, 104, 261, 273–4, 277.]" (Emphasis added.)

Neither of the first two references support the italicized portion of the statement. They support the statement appellant had "an idea" to get $10,000, and did take an unknown amount of the money Melnick had received, across state lines. R.T. 103 states it was a "certain" amount, but further testimony disclosed it was "uncertain," and there is no proof it was $5,000.

And R.T. pp. 261, 273–277 prove only the receipt of the $10,000 (that appellant "needed it," "wanted it," asked for it, and prepared Exhibit 27, a contract with respect to it), but give no proof as to the transportation of $5,000, or any other specific sum of money. Cf. 18 U.S.C. § 2314.

4. The continuing motivation for the payment of these monies from the aforementioned individuals, was the misrepresentations continuously made by the appellant that he was furthering the duo-rail system. These misrepresentations included the following:

"That he (Osborne), had been in consultation with city officials of Kansas City, Missouri, and Los Angeles, California, about this transportation system; and in fact had a franchise for such transportation system in Kansas City, Missouri, and was actually discussing the installation of the same system in Los Angeles; that he (Osborne), had extensive experience in transportation at the operational level; that he (Osborne) would buy the corporate body and name of American Spacemaster Company; that he (Osborne) would and did obtain permits for the

with the sufficiency of the evidence to support the conviction on count twenty. It is unnecessary to repeat such evidence herein in detail.[5]

We pass, then, to the proof of the enumerated substantive wire fraud counts (5, 6, 16 and 18) and the interstate transportation of money fraudulently obtained (19). But before that, we consider certain errors in law allegedly occurring.

## II. Grand Jury Testimony.

We first will consider the point made in Appellant's Supplemental Brief (Appellant's Specification XII)—the refusal of the trial court to permit the defense to inspect the grand jury testimony of certain witnesses.

Appellant Osborne had already seen certain of the grand jury testimony taken in Southern California delivered to him at the time of appellant's previous trial on another indictment in St. Joseph, Missouri. There his conviction for conspiracy to rob certain banks, and aiding and abetting bank robberies, was reversed because the testimony of his two codefendants (Richard Leu and Mary Dorrel, who had entered pleas of guilty in the Missouri case, and who had implicated Osborne in the offenses charged), given before a grand jury in California by Leu and Dorrel *which had not been offered or admitted in evidence at appellant's Missouri trial,* was by mistake delivered to the jury by the Missouri court clerk, and highly prejudicial and inadmissible evidence contained within such transcript was possibly before the jury.

During Leu's testimony, Osborne's counsel in the Missouri trial had asked for and received the grand jury testimony of Leu, but made no use of it and it was not introduced in evidence. For the complete story, see Osborne v. United States, 8 Cir., 351 F.2d 111 at 114, et seq. The eighth circuit first held: "The delivery to the jury for their consideration of an exhibit not received in evidence constitutes error," citing cases (351 F.2d at 115).

It next held the error was prejudicial, because the general rule was that: "[P]lacing before the jury evidence of

---

issuance of stock and debentures for the California corporation that was paid for by victim Rabe; that he (Osborne) had hired a transportation engineer, Drexel Carlson, to assist in the creation of the duo-rail transportation system; that he (Osborne) had a buyer for the entire plan at a price of $350,000.00; that the various persons brought into the venture (Webb, Hodges, Christofer), by Osborne were reputable businessmen; that he (Osborne) had been the victim of a theft of certain patents [R.T. 223–4, 257–258, 262, 200–1, 199, 614, 616–7, 236, 248–9, 251–2].

"Drexel Carlson, the aforementioned engineer, on direct testimony categorically denied such employment [R.T. 257–8, 517–18]. As to the buyer allegedly ready, willing and able to buy the entire system at the price of $350,-000.00 [R.T. 262], the buyer was never produced by appellant.

"The representation by appellant that he had contacted various Los Angeles City officials to discuss the duo-rail system was categorically denied by said officials [R.T. 711, 730, 732, 737].

"The representation by appellant that he was active in, and an expert in, the field of transportation was categorically denied by one Shafer, a Kansas City Councilman, who testified that he knew all the people in transportation in Kansas City, Missouri [R.T. 563–4], and by one Eyer, a long-time president of the Kansas City Transportation System [R.T. 519–20]. Finally, the representation that appellant had obtained permits from the California Corporation Commissioner for the issuance of stock and debentures was categorically denied [R.T. 714–15], by Thomas Doyle, an investigator for the California Corporation Commissioner." (Appellee's Brief, pp. 6–7.)

5. Appellant argues that the evidence was insufficient to show a fraudulent intent. He cites good law that such an intent is essential. He then states that "absent inadmissible hearsay statements discussed in his Specification of Error I," (statements of Melnick and Reagan) "there is no evidence in the case that appellant got any of the money." (Brief, p. 62.)

This simply is not true. Miss Rabe testified she personally gave the appellant $398.00 on February 8, 1962, representing the proceeds of Exhibit 11, and $984.00 on February 8, 1962, representing the proceeds of Exhibit 12. (R.T. pp. 215–217.)

other crimes committed by the defendant constitutes prejudicial error." (Citing cases. 351 F.2d at 117.) This included Leu's testimony Osborne had "concluded a business deal at the point of a gun," and "had a witness taken care of" who was thereafter known as "Seldom Seen." (Id., pp. 117, 118.)

(a) *First Request for Inspection.* (Webb, R.T. pp. 132–134):

At his California trial, appellant Osborne sought to prove by the grand jury testimony that "a witness" (F.B.I. Agent Yates Webb) before "some grand jury" had accused Robert Webb, *then* testifying against Osborne, of "robbing savings and loan associations," (p. 132) and having "over 50 hot checks or insufficient fund checks out in several states." (R.T. p. 133.) Osborne was permitted to ask Webb if he had been promised any immunity for his testimony, and Webb denied this. F.B.I. Agent Yates Webb did not testify at this trial against appellant.

(b) *Second Request for Inspection.* (Yergin, R.T. pp. 627–628):

Osborne also sought to prove when cross-examining Callie Yergin, by grand jury testimony, "that a different set of facts was presented under oath to the grand jury." Contrary to appellant's Supplemental Brief, page 2, no reference was made as to 'whether it was Mrs. Yergin, or someone else, who had presented "a different set of facts." (R.T. p. 627, ll. 18–24.)

(c) *Third Request for Inspection.* (Rabe, R.T. pp. 706–710; 758–760):

Osborne again sought a transcript of grand jury testimony after the plea of guilty by his codefendant Melnick, "in that I have knowledge and believe that perjury was presented before that grand jury; that inflammable untrue, wild and ridiculous statements were made to that grand jury in order to get this indictment against me." (R.T. p. 706.)

This oral motion was supplemented by a written motion. The written motion did not refer to "untrue, wild or ridiculous statements" made by anyone, but asked for the testimony of six witnesses, including Mrs. Yergin. The "untrue, wild and ridiculous statements" were orally alleged to have been made by the appellant's Missouri codefendants Leu and Dorrel.

In other words, neither Yates Webb, Leu or Dorrel could under any circumstances be classified as "key witnesses" against appellant at the trial at which he was convicted in California, for they were never called as witnesses. Thus appellant's first and third requests are each factually without merit.

But Mr. Osborne's second request and his written motion did include a reference to Mrs. Yergin's testimony. Mrs. Yergin could be classed as a key witness. For that reason we consider the effect and requirements of Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L. Ed.2d 973 (1966): the Court ruling in Part III thereof that it was reversible error for the trial court to refuse to permit the defense to inspect the grand jury testimony of government witnesses. The Supreme Court first said:

"This Court has recognized the 'long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts.' United States v. Procter & Gamble Co., 356 U.S. 677, 681 [78 S.Ct. 983, 986, 2 L.Ed.2d 1077]. And it has ruled that, when disclosure is permitted, it is to be done 'discreetly and limitedly.' Id. at 683, 78 S.Ct. at 987. Accordingly, the Court has refused in a civil case to permit pretrial disclosure of an entire grand jury transcript where the sole basis for discovery was that the transcript had been available to the Government in preparation of its case. *Procter & Gamble,* supra. And, in Pittsburgh Plate Glass Co. v. United States, supra, the Court sustained a trial court's refusal to order disclosure of a witness' grand jury testimony where the defense made no showing of need, but insisted upon production of the minutes as a matter of right, and where there was 'overwhelming' proof of the offense charged without reference to the witness' trial

testimony." (384 U.S. at 869, 86 S.Ct. at 1848.)

The Supreme Court then detailed the five circumstances which required a reversal in *Dennis,* supra:

"The record shows the following circumstances:

"1. The events as to which the testimony in question related occurred between 1948 and 1955. The grand jury testimony was taken in 1956, while these events were relatively fresh. The trial testimony which petitioners seek to compare with the 1956 grand jury testimony was not taken until 1963. Certainly, there was reason to assay the latter testimony, some of which is 15 years after the event, against the much fresher testimony before the grand jury. [Footnote omitted.]

"2. The motions in question involved the testimony of four of the eight government witnesses. They were key witnesses. The charge could not be proved on the basis of evidence exclusive of that here involved.

"3. The testimony of the four witnesses concerned conversations and oral statements made in meetings. It was largely uncorroborated. · Where the question of guilt or innocence may turn on exactly what was said, the defense is clearly entitled to all relevant aid which is reasonably available to ascertain the precise substance of the statements.

"4. Two of the witnesses were accomplices, one of these being also a paid informer. A third had separated from the union and had reasons for hostility toward petitioners.

"5. One witness admitted on cross-examination that he had in earlier statements been mistaken about significant dates." (384 U.S. at 873, 86 S.Ct. at 1850.)

We compare these circumstances with the facts of this case:

1. Instead of the events taking place one to eight years prior to the grand jury testimony, and eight to fifteen years prior to the trial testimony (as in *Dennis,* supra), in the instant case the events all took place within three years of the indictment, and less than five years before trial.

2. Instead of the motions involving testimony given by four of the eight government witnesses against Dennis, they involved at best six out of twenty-four.

3. The testimony of the four witnesses in *Dennis,* supra, was largely uncorroborated conversations or oral statements. Here the testimony of Yergin, and the others mentioned, was thoroughly corroborated by the many other witnesses, and by the written evidence (30 exhibits for the government alone).

4. Although there apparently was some question in the trial judge's mind as to whether or not Mrs. Yergin might not have properly been brought into the case as a defendant (R.T. p. 1155), because she had brought Melnick into contact with Osborne, she was never charged as an accomplice.

5. While Mrs. Yergin was uncertain about details, she admitted no mistakes about significant facts or dates.

■ We thus cannot find the required similarity between this case and that of *Dennis,* supra, sufficient to make the *Dennis* rule applicable here, in view of all the testimony in this prolonged trial. On the showing made at the trial by the appellant, the trial judge might well have decided, in an abundance of caution, to grant an "in camera" inspection appropriate when there is a showing of "particularized need" for disclosure of grand jury testimony. Pittsburgh Plate Glass Co. v. United States, 360 U.S. at 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), and *Dennis,* supra, at 874. In view of all evidence, we find no reversible error in the trial court's ruling, and his refusal to act on Osborne's requests.[6]

6. Fed.R.Crim.P. 52(a).

III. Alleged Evidentiary Errors. These were:

(a) The admission of statements of Melnick, Christofer and Hodges as to alleged statements made by Melnick and Reagan (Appellant's Specification I);

(b) the exclusion of evidence re Miss Rabe's investigation of patents, etc. (Appellant's Specification III);

(c) the exclusion of evidence of the reputation of witness Webb for truth and veracity (Appellant's Specification V);

(d) the exclusion of evidence to impeach Webb by showing bias and prejudice (Appellant's Specification VII).

We consider each in turn:

III(a) (i). Reagan's alleged statement was testified to by witness Christofer. It was offered under the theory Reagan was an agent of Osborne. (R.T. pp. 527–529.) A motion to strike all of Reagan's testimony was denied, without prejudice, upon the government's offer to produce Reagan to "tie up" the agency question. (R.T. p. 529, ll. 4–16.) The court, however, did strike all references to Reagan's alleged opinion "that it was a fraud or to deceive." (R.T. p. 529, ll. 20–25.) Reagan testified (R.T. pp. 531–544) on direct examination no such opinion was expressed by Reagan, nor was he asked for any opinion, either on direct or cross-examination. Under the total circumstances, no evidence of any consequence remained in the record, and nothing to which appellant Osborne could object. All testimony related to acts and meetings taking place during the period of the conspiracy charged.

III(a) (ii). Melnick's statements given to Mrs. Yergin (Plaintiff's Ex. 42) read as follows:

"To whom it may concern:

"This is a statement by Sam Melnick concerning Miss (sic) Callie Yergin.

"I hereby wish to state that Callie Yergin did not receive any of the monies given to me which were turned over to Mr. Alfred H. Osborne for American Spacemaster Development Co., Inc., for herself, directly or indirectly.

Sam Melnick"

This document undoubtedly did attempt to exculpate Mrs. Yergin, but it did *not* attempt to incriminate appellant Osborne. It states monies were given by Melnick to Osborne *for* Spacemaster Corporation. This coincided with appellant Osborne's explanation of where the $119,000 that disappeared went, i. e., into the corporation.

There was other testimony (including that of Osborne himself, supra) that he had received some *monies*. Even in his brief his position is that there was a lack of proof—not that he had received any money, but that he had not "received any *substantial amount* of money which the Rabe family gave to Melnick." (Emphasis added. Brief, p. 30.)

Appellant's motion to strike was based upon the theory the statement of Melnick, an alleged coconspirator, made during the period of the alleged conspiracy was "Out of my hearing * * * not in my presence. I had no notice of it and that is hearsay as far as defendant Osborne is concerned, and it assumes facts not in evidence * * * and calls for a conclusion of a witness."

■■ Such objections have no validity where the evidence is offered to aid proof of the existence of the conspiracy, if corroborated by other evidence, as here. Carbo v. United States, 314 F.2d 718 (9th Cir. 1963); Atkins v. United States, 307 F.2d 937 (9th Cir. 1962). It was admissible against Melnick as an admission against interest. No request was made to instruct the jury it should be admitted against Melnick only. Counsel for Melnick stipulated it could be admitted into evidence without objection. (R.T. p. 613.) Appellant said nothing. There was no error. "Under these circumstances, there was a waiver of any objection which might, in a different setting, have been properly presented." Helberg v. United States, 365 F.2d 314 (9th Cir. 1966).

III (a) (iii). Hodges' statements were introduced, not as statements made during the course of a conspiracy (for they were made after indictment) but as admissions against interest, made in an alleged conversation in Houston, Texas in 1964, in the presence of Mr. Melnick, Mr. Osborne, Mr. Webb, Mr. Jack Atkinson, and Mr. Hodges. Mr. Webb said he received $500 of the $10,000 advanced by Mrs. Curry in 1963; Mr. Melnick said he received $5,000, out of which he paid $500 to Webb, and Mr. Melnick said "Mr. Osborne got $5,000." (R.T. p. 169, l. 25.)

To this statement, made in Mr. Osborne's presence, he made no reply, objection nor denial. (R.T. p. 171, ll. 6–13.)

"Q. Did Mr. Melnick make any other comment about the money that he had received at other times?

"A. He said that Mr. Osborne had received about 80 per cent of the money.

"Q. Of the money received at other times?

"A. Yes, sir." (R.T. p. 170, ll. 1–6.)

*No objection was made on any ground to such testimony.*

That the court was ruling properly and in favor of the appellant when objections *were* made, as required, is amply demonstrated by a perusal of the entire record. In fact, when the government asked the next question in an improper form, calling for the conclusion of the witness, the court promptly sustained the objection.

 Neither defendant properly protected the record, and appellant cannot now object for the first time. Silence in the face of an accusatory statement, where understood and there exists an opportunity to deny, is admissible as an admission of guilt. Sparf and Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895); Sandez v. United States, 239 F.2d 239 (9th Cir. 1956).

Thus, we can find no error relating to the admission of evidence.

 III(b), supra, refers to alleged error in excluding evidence with respect to Miss Rabe's investigation into and the acquisition of certain patents (referring to questions asked and objections sustained. R.T. pp. 359–360, 367; 813–819). No offer of proof was made the first time the evidence was offered; the offer of proof was refused on the second time it was offered, upon the ground it was immaterial whether the patents had expired, or been sold to someone else, either by Melnick or Osborne or anyone else; or that Miss Rabe thought they were good when she advanced the money to the alleged conspirators.

We find no error.

III(c). Appellant urges he should have been allowed to attack the reputation of witness Webb for truth and veracity.

This he proposed to accomplish by cross-examination of witness Hodges and offered into evidence Defendant's Exhibit D (R.T. p. 175) for identification. The court denied the offer, stating: "The bad reputation of *a party* may be put in evidence only when good character evidence is introduced, and the character of a *witness* may never be put in evidence." (Emphasis added; R.T. p. 177.)

We have examined Defendant's Exhibit D for identification, and agree it is not, per se, admissible.

While the court's statement may have enunciated too broad a statement of what the law is, appellant has produced little to dispute the correctness of the court's ruling.

Hodges, then an inmate of a Missouri prison, was impeached by his admission of a conviction of a felony, and then testified to the Houston, Texas meeting where Osborne, Melnick, Webb, Hodges and Atkinson discussed Osborne's receipt of part of Mrs. Curry's $10,000.

No questions were asked Hodges with respect to the details of this Houston conversation. No mention of the Houston conversation appears in Defendant's Exhibit D for identification. When the offer of Exhibit D into evidence was refused, appellant went into the Houston meeting in some detail, and obtained the

government's statement of what Hodges had said to the F.B.I. when it was determined he would be called as a witness. (Plaintiff's Ex. 2 for identification.) Thus appellant never asked the necessary questions to lay the foundation upon which he could have asked the trial court to rule on the admissibility of Exhibit D for identification.

Appellant twice cites in support of his legal position the same four cases: United States v. Harris, 331 F.2d 185, 188 (4th Cir. 1964); Creekmore v. Crossno, 259 F.2d 697, 698 (10th Cir. 1958); Sawyear v. United States, 27 F.2d 569, 570 (9th Cir. 1928); and Swafford v. United States, 25 F.2d 581, 584 (10th Cir. 1928).

In *Harris,* supra, the government sought to prove the bad character of the defendant Harris. The circuit court held this was error.

"It is well settled in this circuit that a defendant who voluntarily offers himself as a witness and testifies in his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. Thus, the prosecution may inquire of him, by way of impeachment, whether he has been convicted of a felony, infamous crime, petit larceny or a crime involving moral turpitude. If he ·denies prior convictions of specific offenses concerning which he is interrogated, evidence thereof is admissible as bearing upon his credibility as a witness and for no other purpose. Furthermore, if the defendant testifies as a witness in his own behalf, his general reputation, like that of any other witness, for truth and veracity in the community where he resides, among his friends, neighbors and acquaintances and the people with whom he transacts business, may be shown. These principles are so well recognized as to require little or no discussion.

"Equally well established is the legal principle that in a criminal case the defendant's general character cannot be attacked by the Government unless evidence of his good character is first introduced by him. As stated in United States v. Walker, 313 F.2d 236, 238 (6 Cir. 1963),

"'* * * Accordingly, if the defendant calls character witnesses who testify to his good character in general, the Government can meet this evidence by the introduction of witnesses who contradict such testimony, but, in the absence of such character witnesses introduced by the defendant, the Government is not entitled to introduce testimony concerning the defendant's bad character.'" (331 F.2d at 187–188.)

In *Creekmore,* supra, the party sought to be impeached was not merely a witness, but a *party.* Held: "[T]he reception of the impeaching testimony was clearly erroneous." (259 F.2d at 698.)

In *Sawyear,* supra, it was held error to have refused to permit a prohibition agent to describe his previous occupation, but the ruling was held not to be prejudicial error. (27 F.2d at 570.)

In *Swafford,* supra, the court allowed a witness to state whether another witness' reputation for truth and veracity was good or bad. Further than that the witness was not allowed to go.

But as we have stated, while the court's idea of what the legal rule was, was enunciated, no question was ever asked which required a ruling; and thus no test made of the validity of the court's idea of the law. The matter was never ruled upon by the trial judge. There can be no error claimed by reason of a ruling that never took place.

■ We conclude appellant never properly attempted to attack Webb's reputation for truth and veracity in his cross-examination of Hodges.

III(d). The attempt to impeach Webb by proof of bias or prejudice.

Appellant refers to the Reporter's Transcript, Vol. III, pages 132–134, as the place where he attempted to impeach. He apparently attempted to show that someone else had testified before a grand jury and accused Webb of robbing savings and loan companies, but that the government had not prosecuted Webb.

Such proof would not be impeachment. Osborne could not ask Webb if someone had so testified previously. Appellant was permitted to ask Webb if he had been promised any immunity. Webb replied he had not.

Appellant's other questions were faulty in form and objections made to them were properly sustained.[7]

Appellant's point on this issue is totally unsupported by the record, and we find no error.

IV. Six Alleged Procedural Errors:

(a) Participation by assigned counsel. (Appellant's Spec. II.)

(b) Informing the jury defendant Melnick's case had been disposed of by a guilty plea. (Appellant's Spec. IV.)

(c) Inability of defendant to conduct his defense. (Appellant's Spec. VI.)

(d) Prejudicial comments and conduct by the court and the prosecutor. (Appellant's Spec. VIII.)

(e) Denial of a speedy trial. (Appellant's Spec. IX.)

(f) Denial to right of compulsory process. (Appellant's Spec. X.)

Again, each will be considered in turn.

IV(a). Appellant is a former lawyer, who, as he says, "surrendered his license 12 years before his instant trial."

■ The forty-eight motions made by appellant during this trial indicate he was familiar with a lawyer's opportunities, if not with a lawyer's duty, from the second time he interrupted the court's reading of the indictment to complain of the court's emphasis, and asked the court to then instruct the jury as to the law (R.T. pp. 34, 35), to the motion to set aside the verdict (R.T. p. 1135) eleven hundred pages later. So that appellant could not urge on appeal he had no attorney, the trial judge required Mr. Novak to sit with the appellant to render any assistance requested or required. Mr. Novak did that; including arguing to the jury. (Both he and appellant were permitted to argue on appellant's behalf.)

We are compelled to state that it is our conclusion from a careful study of the record, that Mr. Osborne was attempting to establish a record whereby he could later claim a lack of representation by any attorney. This is what the trial judge was determined to prevent. (C.T. pp. 7–10.) We conclude he succeeded. Mr. Osborne had proper and adequate legal representation throughout the trial, and the required participation by assigned counsel assured it.

■ IV(b). Appellant next complains of what was said when co-defendant Melnick, out of the jury's presence, entered his plea of guilty. The trial judge stated when the jury returned:

"The defendant Melnick's case has been disposed of by plea in this case, so that he is no longer on trial at this time. He is not on trial at this time."

No objection was made to this statement. No request was then made for any other instruction to the jury.

Later, after the jury had been instructed, and in the course of twenty-four objections to the court's instructions, the appellant stated:

"I further request that the jury be instructed that the fact that Melnick no longer is a defendant cannot be used or considered as evidence of guilt of the defendant Osborne."[8]

The court apparently considered the matter had been sufficiently covered by instructions already given, particularly the following:

"You are here to determine the guilt or innocence of the accused Alfred H. Osborne, Sr., from the evidence before you. You are not called upon to return a verdict as to the guilt or innocence of any other person or persons. So if the evidence convinces you beyond a reasonable doubt of the guilt of the accused, you should so find, even though you may believe one or

---

7. For example, R.T. p. 13, line 6; p. 131, lines 23–25; p. 132, line 8.

8. Appellant has not complied with Rule 18 in urging this point.

more other persons are also guilty." (R.T. p. 1102.)

This, by inference at least, meant appellant stood alone as a defendant, and that his acts only were to be judged.

We agree the instruction was sufficient. Had the trial judge not stated that Melnick's case had been terminated by plea, the appellant could have urged a mere statement of termination implied a dismissal as to Melnick; or if nothing were said, the jury might have speculated as to what had happened, and that in either event there had been prejudice to the defendant.[9]

Further, the defendant points to no instruction he had proffered, as required by local court rules.[10]

In United States v. Toner, 173 F.2d 140 at 142 (3rd Cir. 1949), the judge was requested to instruct the jury that a codefendant's plea of nolo contendere, just before trial, was not to be considered by the jury in determining whether Toner was guilty. The judge did so, and then added: "but the jury can take into consideration that one of two coconspirators did plead guilty, and make such use of it as they see fit."

Thus the *Toner* facts are not the facts of this case, and it has no persuasive power here.

Appellant urges other cases allegedly support his thesis. Alexander v. United States, 354 F.2d 59, 61–62 (5th Cir. 1965); United States v. Crosby, 294 F.2d 928, 948 (2d Cir. 1961); Babb v. United States, 218 F.2d 538, 541 (5th Cir. 1955); LeRoy v. Government of Canal Zone, 81 F.2d 914 (5th Cir. 1936).

*Alexander*, supra, relates to a confession and other admissions of a codefendant (Pickens) which involved Alexander in a bank robbery.

*Crosby*, supra, cites the general rule (with which we agree completely) that a guilty plea of one defendant cannot be used against the remaining defendants. It also holds it was not error to deny a retrial when McCarthy (a codefendant) pleaded guilty. Therein are cited (at p. 948) many cases supporting the rule which need not be duplicated here. This rule is sound, even though the jury is present when the codefendant pleads; Davenport v. United States, 260 F.2d 591 (9th Cir. 1958); Wood v. United States, 279 F.2d 359 (8th Cir. 1960); Richards v. United States, 193 F.2d 554 (10th Cir. 1951); or the court instructs a jury that a defendant has plead guilty. Nemec v. United States, 178 F.2d 656 (9th Cir. 1949); Holmes v. United States, 134 F.2d 125 (8th Cir. 1943), cert. den. 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722.[11]

In Babb v. United States, supra, there was not merely a plea of a codefendant during a trial. There the coconspirator,

---

9. This quandary is fully discussed in one of the cases cited in appellant's brief. United States v. Crosby, 294 F.2d 928, 948 (2d Cir. 1961), (also a mail fraud case) where there were fifty counts, and seven individuals. Codefendant McCarthy pleaded guilty toward the end of the first week of trial.

10. United States District Court, Southern District of California, Rules of Criminal Procedure, Rule 1; Rules of Civil Procedure, Rule 14(a). "[P]roposed instructions in writing * * * *shall* be presented to the court * * * as soon as possible after the opening of the trial, but the court in its *discretion may at any time prior to the opening of argument* to the jury receive additional such requests." (Emphasis added.)

Here the trial opened May 18, 1965. (R.T. p. 33.) Melnick entered his plea May 26, 1965 (R.T. p. 1006). It was on June 1, 1965, that appellant orally requested the instruction which he now claims is error. (R.T. p. 1103.) Thus his requested instruction was improperly and untimely made. We have, however, considered the point on its merits.

11. We again think extraordinarily apt the words of Judge Augustus Hand in United States v. Fradkin, 81 F.2d 56, 59 (2d Cir. 1935):

"A man takes some risk in choosing his associates and, if he is hailed into court with them, must ordinarily rely on the fairness and ability of the jury to separate the sheep from the goats."

Broussard, was called as a witness, and testified, over objection, he had plead guilty to all of the counts of the indictment. This was the equivalent to the procedure held improper in LeRoy v. Canal Zone, supra, i. e., the admission into evidence, over objection, of the judgment of conviction of the two defendants not on trial.

Thus none of the cases relied on by appellant support the position there was error in this record before us.

■ IV(c), supra, relates to alleged violation of defendant's Sixth Amendment rights—that he allegedly "could not prepare, counsel, or conduct his defense privately, without intrusion by the government."

Appellant's primary objection is that codefendant Melnick pleaded guilty. He had the right to do so. And the possibility of such a plea exists in every trial wherein more than one defendant is indicted. Appellant accused Melnick's counsel of supplying the government with "papers," but these were stated by the government to have been the exchange of instructions required by court rules. No protest by appellant followed this reasonable explanation.

To urge that Melnick was not "a true defendant" means nothing. He was sentenced on his plea of guilty and sentenced to three years, and is serving his sentence.

Appellant also states that the government was put in charge of appellant's defense witnesses, and that appellant and his files were searched. Neither statement is borne out by the record.

We quote with approval from the government's brief:

"The appellant had experienced some difficulty in obtaining the attendance of several witnesses he had subpoenaed. The prosecution volunteered to ascertain the availability of the witnesses subpoenaed and to convey to these witnesses the District Court's ruling that they could appear at a date other than that set forth on the subpoenas. Thus, the record confirms that the government actually and *only* assisted and offered assistance to the defense in obtaining the attendance of the witnesses requested by appellant [R.T. 898–909].

Prior to the commencement of actual trial proceedings, both defendants were searched for concealed weapons. This search was accomplished in an anteroom, out of the sight of the jury, and in fact, not even in the courtroom where the trial was held. It is this search that the appellant alleges is reversible error.

At the factual level, the final constitutional argument posed in specification #6 attacks the above search to which appellant was subjected prior to trial. As appears from the record [R.T. 15–29], the lower court authorized a search of all the parties to ascertain if *anyone* was carrying a concealed weapon. No records, documents, or evidence of any kind contained on the person or in the files of any of the parties were examined, read or in any way used." (Appellee's Brief, p. 21.)

We hold the record fails to disclose any denial of appellant's Sixth Amendment rights.

IV(d). The claim of appellant that there were prejudicial comments and conduct by the trial judge is hardly worthy of mention. Much of the claim is inaccurate. More of it is unfair.

Any unbiased reading of the transcript indicates the trial judge leaned over backward, just as he said he intended to do, from the very start of the trial,[12] in protecting appellant's rights. His rulings were fair and judicious. His comment was restrained. His conduct was worthy of praise, not condemnation.

We find no merit in this specification.

■ IV(e). Neither do we find any merit in appellant's complaint he was denied a speedy trial. By his own admission, his pretrial motions, set for

---

12. R.T. p. 29, line 4 to p. 30, line 5. Cf. also R.T. pp. 50–55.

January 6, 1964, eighteen days after his plea, were put off calendar *at his request*, "subject to be reset by stipulation or *motion of either party*," (emphasis added; R.T., Vol. II, p. 26 and R.T. p. 27).[13] This permitted appellant to defend the Missouri indictment by trial. He was in prison on that conviction until December 24, 1964. Within a month the government took steps to set this case for trial. (R.T. p. 58.) Trial was set for May 18, 1965.

Appellant states flatly in his brief: "The trial court was informed by the government that the case against appellant would be dismissed," citing R.T. p. 48. The citation given does not support the statement made.

On page 48, the court stated: "* * * my clerk [obtained] the information—this may be wrong—the case would probably be disposed of on a plea by Mr. Melnick and a dismissal as to Osborne. And *it could be just the opposite* as far as that is concerned. I am not sure." (Emphasis added.)

We find no denial of a right to a speedy trial under the circumstances disclosed by the record.[14]

IV(f). Appellant asserts he was denied the right to compulsory process.

This is another statement that is simply not true. Repeatedly through the trial, appellant attempted to make a record that he could not obtain the aid of the process of the court.

At first Mr. Osborne protested he did not need any process—that he was "ready for trial. * * * I can go to trial this afternoon." This was on March 15, 1965 (R.T. p. 36).

■ About a dozen times during the trial, the appellant attempted to lay a record as to his inability to obtain subpoenas. He was told he could get subpoenas for the mere asking, but that (a) getting the government to supply funds for the serving of witnesses outside the boundaries of the court, and (b) getting the government to pay witnesses' expenses, were each something else again —that it could be done, but that the rules and statutes as to the proper procedure must be followed by appellant, just as any other defendant.

It readily becomes apparent to one carefully reading the record that the trial judge was not unfair to defendant when he stated (outside the presence of the jury, of course), "I am convinced the defendant is trying this case solely in an attempt to get error in the record for appeal."

We concur and agree with the statement on this aspect of the case appearing in the government's brief.[15]

---

13. The court said on January 6, 1964:
 "So of course this case will be set for trial after the conclusion of that trial [in Missouri], or at least will be set for trial to be tried on a date subsequent to that trial. So if the three of you [the two defendants and the government attorney] can stipulate to a date for the hearing on these motions, at that time I will set it for trial." (R.T. p. 27.)
 "If counsel cannot stipulate them on motion * * * [a]ny Monday at 2 P.M. * * * will be satisfactory. If you cannot, then anyone of the three of you may make a motion." (R.T. p. 26.)

14. Defendant himself, moved through his counsel, Mr. Duncan, on December 16, 1963, for delay (R.T. p. 11). Mr. Melnick asked for delay (R.T. p. 13). The court required preliminary motions to be heard January 6, 1964. On January 6, 1964, the defendant Osborne personally requested the court "to defer all proceedings in this case." (R.T. p. 21, lines 10–11.)
 Incredibly, after *two* such continuances at his own request, and after having been warned not to "play cat and mouse" with the court on his plea for continuances, appellant on March 15, 1965 claimed, as he now does, of "unnecessary delay" and the alleged violation of his right to a speedy trial (R.T. p. 32). He then misrepresented to the court what the court had said to him on January 6, 1964 (R.T. p. 39, lines 3–7). His counsel then agreed to the May 18, 1965 date. Cf. Smith v. United States, 118 U.S.App.D.C. 133, 331 F.2d 784 (1964).

15. "The final claim of violation of the Sixth Amendment rights of the appellant relates to the alleged denial (improperly), by the

We therefore find, and hold there was, no error invalidating the conviction of appellant on Count 20.

V. Alleged Insufficiency of the Evidence to Support Conviction on Counts 5, 6 and 16 (Appellant's Spec. XI A).

We finally come to a point raised by appellant which requires careful consideration.

In Count 5, the defendant's allegedly fraudulent scheme (outlined in Count I) was allegedly executed by a telephone call on March 16, 1963 at 1:11 P.M., by defendants from Los Angeles, California to Kansas City, Missouri.

In Count 6, the same allegedly fraudulent scheme was allegedly executed by a telephone call on March 23, 1963 by defendants from Los Angeles, California to Kansas City, Missouri.

 The government proved certain telephone calls. The government then had the burden of proving their content.

In the government's brief it is stated "additional testimony was adduced from the witnesses Rabe, Yergin and Webster, connecting the following specific calls to the conspiracy and the enumerated wire fraud counts," [16] listing them (p. 8).

While *all* counts are next referred to by the government, we are here only concerned with Counts 5, 6 and 16, telephone calls allegedly made on March 16, March 23 and August 15, all of 1963.

In support of Count 5, the government refers us to R.T. pp. 621, 622 and 588–589. In support of Count 6, to R.T. 622 and 589. In support of Count 16, to R.T. 271–273, 623 and 573.

Exhibit 43 was identified by the witness Yergin. It was a group of her telephone bills for long distance calls to, and from, her telephone (663–9708).

She identified a telephone call made on March 16, 1963 to Kansas City (VA–1–1816) from her telephone in Los Angeles. With respect to it, Mrs. Yergin stated:

"Q. From looking at the exhibit can you point out a phone call that was made on March 16, 1963? Referring now to count 5. March 16, 1963.

"A. I have it right here, but I don't know what was said at that time.

"Q. Can you state as a matter of your knowledge that the phone calls made to Kansas City were made only to Mr. Osborne?

"A. Oh, yes.

"Q. Or Mr. Melnick?

"A. Yes.

---

lower court of appellant's rights to obtain compulsory process at Government expense. The facts are to the contrary. The court at no time denied such right to appellant, and in fact frequently advised him that he had a right to obtain subpoenas at Government expense. The court actually directed the appellant to proceed as the rules provide and the Court stated that it would then direct the issuance of the requested subpoenas. The bitter truth of the matter is that appellant was merely seeking ways and means to delay the trial. The only conclusion that can be drawn from the tactics and actions of the appellant from his requests for the issuance of subpoenas, is that the requests were frivolous and specious [R.T. 72, 294, 297, 706, 752–4, 756–8, 765]. As appellant himself admitted, he knew the proper procedure required to obtain process, but he simply never bothered to comply [R.T. 292].

"Thus, the Government agrees that an indigent defendant has a right to free compulsory process, but in the instant matter the appellant simply refused to avail himself of that right and privilege. Since the issuance of such process is within the discretion of the court [F.R. C.P. 17(b)], his actions in denying same must be sustained, as here, where there was no abuse of discretion." (Appellee's Brief, pp. 24–25.)

16. Webster's only testimony related to two telephone calls. Her best recollection was that they were "around July." (R.T. p. 607, line 20.) The only testimony as to content of the telephone calls:
"Same asked Al how things were going with Spacemaster." (R.T. p. 606, lines 23–24.) "I asked Al how things were coming and he said 'Just fine. It will be next week.'" (R.T. p. 67, lines 11–12.)

"Q. Can you state what was discussed by you when those phone calls were made?

"A. The only thing that I was trying to do was to get Mr. Osborne to call Miss Rabe to ease her mind.

"Q. As to what business endeavor?

"A. Regarding American Spacemaster and her money. Her money, she was so worried." (R.T. 621–622.)

Pages 588 and 589 of the Reporter's Transcript refer to the testimony of Richardson, an employee of the telephone company. He merely testified that on that date, March 16th, the telephone company records (Exhibit 41) show a telephone call was made to Kansas City, Missouri. (See also R.T. p. 601, lines 10 to 19.)

Thus the record pages cited by the government are of no aid in proving what the telephone calls were about, or any of their content. We can pretty well surmise their content, but we cannot convict defendant on Count 5 on surmise. And suppose the conversation was with Melnick, not Osborne?

Turning to Count 6 (R.T. p. 622), the testimony reads as follows:

"Q. I ask you from looking at the exhibit can you identify a call that you made on March 23, '63, having to do with count 6 of the indictment?

"A. That was made to Mr. Osborne, but I don't know what was said. I don't recall. I don't know whether I got him or not.

"Q. When you spoke with Mr. Osborne or made these calls, what was the business about which you called?

"THE COURT: She testified she doesn't know whether she got him or not.

"BY MR. BARNETT:

"Q. My question is when you made the calls to locate him what was the purpose of these calls?

"A. Trying to get him to call Miss Rabe and ease her mind, let her know what was going on regarding American Spacemaster."

Cited reference to Reporter's Transcript page 589 merely proves the fact of the telephone call by the telephone records.

"Q. Do you have a record of a call made on March 23, which is count 6?

"A. I have a record on a toll statement here of a call going to Kansas City, Missouri, March 23rd, and it went to Area Code 816, and the telephone number LO 1–1380."

Again this is not sufficient proof to convict on Count 6.

Turning to Count 16, R.T. pp. 271–272 refer to the testimony of Miss Emalyn Rabe. She stated, on pp. 271–272:

"Q. Was this conversation about American Spacemaster Development Company?

"A. That's all we had to talk about.

"Q. I ask you if you know whether or not a phone call was made on August 15, 1963, by either of the defendants.

"A. A call from Al early A.M.

"THE COURT: Just say 'Yes' or 'No.'

"THE WITNESS: Yes, I'm sorry.

"BY MR. BARNETT:

"Q. Who made this call?

"A. Call from Al.

"Q. Is that defendant Osborne?

"A. Yes.

"Q. Did you speak with him?

"A. I recall nothing of that."

At page 623 of the Reporter's Transcript, Mrs. Yergin testified:

"Q. On August 15, 1963, was a call made?

"A. Yes, sir.

"Q. From where to where?

"A. From Houston."

We should be able to rely on the government's proof, and its ability to point out to us the evidence upon which it relies. We assume it puts its best foot

forward in referring to the evidence. We know telephone calls were put through on certain days, but do we know their content? Do we know that the messages transmitted had the purpose of executing a scheme and artifice to defraud, when we cannot anywhere find what was said?

██ We are satisfied that the government had a difficult job in getting its witnesses—many past the prime of life —to remember precisely what was said; or even who said it. But we cannot assume an unknown and unrelated conversation had an unlawful purpose, without a record to support that assumption. There is insufficient proof in the record of the contents of the telephone calls underlying Counts 5, 6 and 16 to convict defendant Osborne. We therefore reverse his conviction as to these counts.

## VI.

██ There is no need of our considering the errors charged as to Counts 18 and 19 (Appellant's Spec. XI B), for we have affirmed as to Count 20, and the court imposed equal and concurrent sentences under Counts 18, 19 and 20. (Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1929); Browning v. United States, 366 F.2d 420 (9th Cir. 1966).)

We therefore reverse the judgment of conviction as to Counts 5, 6 and 16, and affirm as to Count 20, and remand the matter to the district for further proceedings in conformity herewith.

BROWNING, Circuit Judge (dissenting in part).

With one exception appellant's specifications disclose no error, or error which was not fairly presented to the trial court, or error which was harmless on the whole record. The exception relates to the court's refusal to require disclosure of a trial witness's grand jury testimony for use in cross-examination.

The only possible conclusion that can be reached from a balancing of the interests of the government and appellant (as required by Dennis v. United States, 384 U.S. 855, 871–872, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966)) is that appellant should have been granted access to portions of the grand jury transcript containing Mrs. Yergin's testimony on subjects to which she testified at trial.

The traditional reasons for secrecy (Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 405, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959) (Justice Brennan dissenting)) were obviously inapplicable; and the government has suggested none which were peculiar to this case.

The state has no legitimate interest simply in denying the accused an opportunity to compare the grand jury and trial testimony of government witnesses. Presumably the testimony will be the same. If it is not, "it is unquestionably in the interest of the state as well as of the defendant that such be disclosed and justice assured." Calkins, Grand Jury Secrecy, 63 Mich.L.Rev. 454, 463 (1965).*

In contrast to the absence of need for secrecy, the reasons for disclosure were persuasive.

Mrs. Yergin was an important witness on the "key issue" (note 1, majority opinion) of whether it was appellant or his alleged co-conspirator, Mr. Melnick, who received the money extracted from the victims. Appellant's defense was that he was only a hired business consultant who received small amounts of money for services actually rendered. Mrs. Yergin testified that most of the money obtained from the principal victim was paid over to appellant by Mr. Melnick. Her testimony thus struck at the heart of appellant's defense.

* The numerous state statutes providing for the disclosure of the grand jury testimony of trial witnesses were adopted in order "to remove, as far as was consistent with public policy, the temptation to false swearing before the grand jury." State v. Thomas, 99 Mo. 235, 259, 12 S.W. 643, 650–651 (1889). Calkins, supra at 465 n. 37.

There was reason to question Mrs. Yergin's credibility. She was herself deeply involved in the fraudulent scheme. Prior to trial she obtained a notarized statement from Mr. Melnick exonerating her from having received any of the money obtained from the victims (part III(a) (ii) of majority opinion). The net effect of her trial testimony was to exculpate Mr. Melnick at appellant's expense.

Moreover as the Supreme Court said in *Dennis*, "A conspiracy case [such as this] carries with it the inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants. [citing] Under these circumstances, it is especially important that the defense, the judge and the jury should have the assurance that the doors that may lead to truth have been unlocked." Dennis v. United States, supra, 384 U.S. at 873, 86 S.Ct. at 1851.

Appellant represented that Mrs. Yergin's trial testimony differed from her grand jury testimony. Appellant's motion was denied summarily and the basis for this representation was therefore not explored. In any event, it was not incumbent upon appellant to establish the presence of inconsistencies. Pittsburgh Plate Glass Co. v. United States, supra, 360 U.S. at 401, 79 S.Ct. 1237. As noted, there was no apparent reason for preserving the secrecy of Mrs. Yergin's prior grand jury testimony and substantial reason for a thorough testing of her credibility. In such circumstances, "there is no justification for relying upon 'assumption'" that "no inconsistencies would have come to light if the grand jury testimony had been examined." Dennis v. United States, supra, 384 U.S. at 874, 86 S.Ct. at 1851.

At the very least, the trial court should have examined the grand jury transcript *in camera* to aid the court in disposing of the motion for disclosure—a practice approved by the Supreme Court where a "particularized need" for disclosure has not been fully made out. Dennis v. United States, ibid.