**NEMEC v. UNITED STATES**

**DAWSON v. UNITED STATES.**

Nos. 11975, 12012.

United States Court of Appeals
Ninth Circuit.

Dec. 14, 1949.

Rehearings Denied Jan. 11 and 16, 1950.

Henry C. Todd and Allan Sapiro, San Francisco, Cal., for appellant Nemec.

Morris Lavine, Los Angeles, Cal., for appellant Dawson.

Harvey Erickson, U. S. Atty., Frank R. Freeman, Asst. U. S. Atty., Spokane, Wash., for appellee.

Before BONE, and POPE, Circuit Judges, and GOODMAN, District Judge.

POPE, Circuit Judge.

By an indictment found against them, Nemec and Dawson were charged with devising a scheme to defraud investors in contracts and profit sharing agreements relating to the location and operation of mining claims. The indictment listed 19 separate alleged false and fraudulent pretenses, representations and promises. Fifteen overt acts were alleged to have been committed in carrying out the scheme.

Count 1 charged that the defendants conspired to violate the Act relating to the use of the mails to defraud,[1] and the Securities Act of 1933, as amended.[2] Count 2 charged Nemec and Dawson with violation of the Mail Fraud Act through the same scheme to defraud, and charged that for the purpose of executing the scheme they mailed a certain letter, etc. Counts 4 and 5 charged Nemec and Dawson with employing the same scheme to defraud investors, and that they, for the purpose of executing the scheme, caused certain matters to be mailed to persons named in the indictment.

Count 3 was dismissed, but Nemec and Dawson were convicted on the other four counts mentioned. Each of the appellants asserts that the evidence is insufficient to support the verdict, and they assign error in the admission and rejection of evidence, in certain instructions to the jury, and in other rulings mentioned hereafter.

The evidence, viewed in the light most favorable to the Government, disclosed that Nemec and Dawson were associated in an alleged mining enterprise which had sev-

1. U.S.C.A., Title 18, § 338 [now § 1341].   2. U.S.C.A., Title 15, § 77q.

eral phases and proceeded under a number of different names. Nemec handled the sales end of the enterprise, arranged for the employment of salesmen and the solicitation of investors, furnishing salesmen with brochures containing literature and exhibits to be displayed to the prospective investors, while Dawson acted as a mining scout, looking for mining property to be used in the enterprise, located claims, undertook to acquire certain mining property for the enterprise, employed men to operate the properties, and assisted in arranging for some of the newspaper publicity which was procured. Some $180,000 was collected from investors as a result of the operations of the enterprise.

The plan in its initial phase involved the sale, for the sum of $280 each, of interests in a contract with the Northwest Mining and Engineering Company, a Washington partnership composed of Nemec and his wife, whereby the company was employed to locate 20-acre placer mining claims near Sierra City, California, such claims to be grouped together into 160 acre "association" placer claims. The employment contract provided, and the investors were assured, that when a large area of such claims had been blocked up, the claims would be leased by the company which would then work them in a large scale hydraulic mining operation, claim holders to be paid on a pro-rata basis from the profits derived from the operation. It was represented to the investors that the company had obtained control of valuable placer property at Sierra City and had discovered that large areas of public land in the vicinity of this property were open for location of placer claims. To explain the reason why the promoters were adopting their system of procuring numerous individual locators and soliciting them largely in the State of Washington, the investors were told that under the law one person could locate but one 20 acre claim and therefore numerous locators must be procured in order to acquire an extensive area for large scale operations. It was explained that investors were sought in the State of Washington as it was feared that if persons in California near Sierra City were to learn of the plan, they would start a gold rush to the area and locate the ground before the Northwest Mining and Engineering Company and its associates could acquire the area under the proposed plan.

While the sale of placer claim contracts was under way, the second phase of the scheme was developed. It was claimed that valuable lode veins had been discovered in the same area and some of the old investors, as well as some additional ones, were sold contracts whereby they were to become holders of lode claims to be located by the company, for a fee of $480 per claim.

The next phase of the enterprise involved the organization of the Sierra City Mining Company, a limited partnership. It was to be the operating company at Sierra City to work the proposed lode and placer claims. Interests in the limited partnership were offered for sale to investors at the rate of $1200 for a one percent interest in the earnings.

Meanwhile Dawson called Nemec's attention to some additional ground in Butte County, California, commonly known as the Mammoth Channel. This was an ancient river bed which through geological upheavals had been covered by a very deep lava overcapping. It was not susceptible to placer mining by any of the ordinary methods. This property was listed in the advertising and brochures furnished by the associates as a place where additional placer mining claims might be located pursuant to contracts similar to those being sold, all to the end that after the channel had been blanketed by some 40 different association placer claims it could be operated as a single unit by using a plan of underground sluicing through a tunnel along the ancient river channel commencing at a place where Big Butte Creek had cut through the lava overcapping to expose the channel.

Contracts for the making of locations on the Mammoth Channel were sold at a fee of $385 per 20 acre claim. It was represented that the company had acquired the ground and locations necessary for tunnel sites and for obtaining access to the old stream bed. It was of the essence of the enterprise that the claims were to be located in a continuous body along the course

of the channel so that the gold-bearing gravel could be removed without trespass upon any other ground.

All of these sales campaigns extended over a period of months during which those who had invested their money were continually being assured that the various enterprises were to begin to pay returns on the investment. The government's evidence tended to show that about the time when the investors were likely to become impatient with continued delays, Nemec and Dawson would turn up with some new or additional mining enterprise in which the investors were to be allowed to share and which would be calculated to appeal to their cupidity.

The final development of a phase of the enterprise of that character had to do with the formation of a new partnership known as the Crescent City Mining Company with operating headquarters at Crescent City, California. Investors and prospective investors were advised that an eminent atomic scientist from the Hanford Atomic Energy Plant, a Dr. Rector, had become associated with the original Northwest Mining and Engineering Company and that he, by application of some of the revolutionary new theories of nuclear science, had developed means of recovering gold from black sand which was present in large quantities in the Crescent City area. Rector was a doctor but he was only a chiropractic doctor and the only connection he had with the Hanford enterprise had been as a water tester. Nevertheless Dawson and Nemec secured newspaper publicity in the Crescent City newspaper relating to Rector's supposed achievement as a scientist in developing a new process of extracting gold, and reprints of the newspaper publicity were added to the salesmen's brochures and circulated to the investors. One percent interests in the Crescent City Mining Company were offered to investors at a price of $1200, and a large sum was procured in that manner.

The evidence substantially shows that the 19 misrepresentations charged were made in connection with the enterprise and that the mails were used for this purpose. The evidence shows that the representations were false. It would serve no useful purpose to attempt to review the whole record which contains some 2600 typewritten pages of testimony. With respect to the various placer locations on account of which contracts were procured as indicated, the investors were told that the areas were open for location. It was proven, however, that in most cases the locations which were made and for which money was taken from the investors, were upon patented lands or upon lands withdrawn from location or entry. The areas described in the various lode location certificates were not only not available for location, but the locations themselves were wholly invalid for in no case was a discovery made or a ledge exposed, and the attempt was made to locate so-called association lode claims by reference to the public land surveys in a manner similar to the location of association placer claims. Many of the so-called placer locations contained no workable placer gravel whatever. It was also represented to the mining claim investors that they could not lose their investments because there was sufficient timber on these claims to repay the amount of their investments. This representation was not only false because most of the claims were located on lands not open for mineral entry, but it was false because there was no merchantable timber on any of the supposed claims.

While it was represented that the claims located along the Mammoth Channel would be blocked up solidly to permit continuous operation, the evidence showed that the claims actually located were widely scattered and largely located upon patented ground or ground not open to mineral entry. It was proven that the representations that the necessary tunnel site and other access ground for the Mammoth Channel area had been procured were wholly false. Capping the whole thing was the story about the eminent nuclear physicist, Dr. Rector, with newspaper publicity which suggested that thanks to his profound knowledge of atomic energy he was about

to produce processes reminiscent of the dreams of the ancient alchemists.[3]

What we have said is sufficient, we think, to disclose that the fantastic falsity of the representations was only matched by the well-nigh incredible cupidity of the investors. The court told the jury: "You are further instructed that good faith and an honest purpose on the part of any defendant is an absolute defense as to this charge. It matters not how visionary you may find the enterprise to be, or how unreasonable the prospects of success in any of the enterprises referred to in the evidence may seem to you, if the defendants actually believed in them." But as stated in Rudd v. United States, 8 Cir., 173 F. 912, 913, in which this same principle was declared: "A representation may be so obviously without foundation as to afford cogent evidence of a criminal intent in him who makes it * * *." In Crane v. United States, 9 Cir., 259 F. 480, this court so held, where preposterous claims of supernatural powers were sufficient to make the case one for the jury.

Dawson asserts that the evidence was insufficient to sustain his conviction because he did not participate in the sales campaign. The evidence fully supports the government's theory that he was a full participant in the fraudulent aspects of the enterprise. It was Dawson who arranged for the location of the placer claims. He signed the statements of markings of boundaries and performance of required discovery work. In addition to the infirmities in these locations previously mentioned, a qualified mining engineer, with years of experience in the area, testified that the Sierra City claims located and certified by Dawson fell into two classes. One class included those located along the river, which were described as a nest of boulders, where it would cost three to four dollars a yard to mine, with maximum recoveries of not to exceed 15 cents per yard. The other class of claims was one "in which there was no stream gravel at all, nothing but the bare hillside bed rock. That of course could not by any means be construed as placer ground. No patent could ever be obtained on it, for the reason that there was no evidence of visible stream gravel in place." On cross examination Dawson by evasions refused to answer how he had accomplished the "open cut work" which he certified had been performed as discovery work on the claims.

Dawson was also active in setting up Dr. Rector as an atomic scientist. On one occasion, after Rector had been giving a demonstration at Grants Pass, Oregon, he said to Dawson, "I hope they don't find out I'm a chiropractor down there, I might get in a jam", to which Dawson replied, "That would never do."

Dawson told an investigator that he and Nemec, in due time, would "cut the pie", referring to the profits of the enterprise. He was constantly found in association with Nemec, and with Nemec he drew checks on the bank account made up from collections from investors.

Not only does Dawson's knowledge of the worthlessness of the claims, and of the

---

3. Dawson furnished Rector with a report, purporting to be written by one J. Walter Kuttruff, describing a method whereby gold values in excess of $100 per ton could be produced from supposedly barren rocks. It said: "The recovery of lead, copper, silver and gold from rocks which after being subjected to all known methods of analysis and failed to reveal the presence of such elements until treated by the method devised by these investigators, led them to further conclude that the atoms of those elements in these rocks did exist in the above described state, and this has caused them to make the following statement: 'We have demonstrated the existence of matter in a state which has not as yet been recognized by science'." Dawson, Nemec and Rector then arranged for the printing in the Crescent City "Triplicate" of an interview with Dr. Rector in which Rector was quoted as follows: "He went on to say, in an exclusive Triplicate interview, that 'Experiments conducted by me personally, indicate that when the laws of nuclear physics have been applied, the above elements can be extracted from ore which shows no previous electro-spectrographic indication of these metals.'"

false pretensions of Dr. Rector show him a full participant in a scheme to defraud, but the circumstances were such as to warrant the jury in finding that he must have foreseen and known that resort would be made to the mails to carry the scheme into execution.

■ The facts thus recited, are of course only the Government's version, but the jury were entitled to accept them. Their recital suffices to show that no question is raised here which has not been passed upon many times by the courts. The case of Blue v. United States, 6 Cir., 138 F.2d 351, contains a full discussion of the elements of the offenses here charged, and of the quantum of evidence required to establish them. What is said there sufficiently discloses the reasons why, in our opinion, the evidence was sufficient to find both appellants guilty as charged.

■ Complaint is made of the action of the court in admitting in evidence a certain "Desist and Restraining Order" issued by the Corporation Commissioner of the State of California requiring Nemec and others to desist from selling securities in that State. But since it was shown that Nemec was representing to the Washington investors that his reason for letting the people of Washington, rather than those in California, invest in his enterprise, was his fear that the Californians would start a gold rush, the Government was properly permitted to show that this representation of his reasons was false, and just why it was false, and that he had moved his activities to the State of Washington for an entirely different reason.

■ Complaint also is made of some of the instructions given. The appellants are not in a position to complain of the court's charge for the reason that no objections were made and no exceptions taken by either appellant, but on the other hand counsel announced that they were satisfied with the court's instructions. Nevertheless we have examined the charge of the court, and in our opinion it was full and fair, and not subject to criticism in any of the respects listed by appellants.

■ Before the jury was impaneled and on the morning when the case was about to be called for trial, Rector, who was a co-defendant, changed his previous plea of "not guilty" to "guilty". It was claimed that the record shows that this was done while the jurors were in the courtroom, and that the action of the court in permitting this plea of guilty to be entered at that time was prejudicial error. Since it was inevitable that during the trial of the case it would be developed that Rector was named in the indictment and that he had pleaded guilty, we think that appellants' complaint upon this point is wholly without merit, particularly in view of the fact that the court adequately cautioned the jury against permitting this circumstance to affect their determination of the guilt or innocence of the other defendants.

■ Additional specifications concern various rulings of the court upon the admission of evidence. Complaint is made that the court rejected offer of proof of an anonymous article in the Crescent City newspaper, attacking the Securities and Exchange Commission for its unfriendly attitude toward mining ventures. We think the court's ruling clearly correct. Another objection is to the admission of letters written to investors after their money had been obtained. These were properly received for the reasons stated in Marshall v. United States, 9 Cir., 146 F.2d 618, and cases cited at page 621, 157 A.L.R. 241.

■ It is said that the accused were denied a fair trial in that Dr. Rector, called as a government witness, changed his testimony during the trial, and in the presence of the jury admitted that his earlier testimony was perjured. The whole matter went to the weight, not to the admissibility of his testimony. Since the court gave the usual instruction relating to a witness false in part of his testimony, etc., we find no ground for reversal here.

■ Finally, complaint is made that the United States Attorney addressed improper and inflammatory remarks to the jury. Since no objection or request for an admonition by the court was then made, ap-

pellants cannot argue this matter here. Cain v. United States, 8 cir., 19 F.2d 472. Cf. Langford v. United States, 9 Cir., 178 F.2d 48.

■ In any event, we think the remarks complained of were not improper.

We have carefully examined all contentions presented by counsel for the appellants, some of whom were appointed by the court. Notwithstanding the able presentation made we find no error in the record. The judgments are accordingly affirmed.