[Crim. No. 10190.   In Bank.   May 31, 1967.]

THE  PEOPLE, Plaintiff  and  Respondent, v. THOMAS LAMAS VARNUM, Defendant and Appellant.

Thomas Lamas Varnum, in pro. per., and Lester M. Fleischner, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—A jury found defendant guilty of assault with intent to commit robbery, first degree robbery, kidnaping with bodily harm for the purpose of robbery, and first degree murder. It fixed the penalty for kidnaping at life imprisonment without possibility of parole and the penalty for murder at death. A motion for new trial was denied. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

At a previous trial the jury fixed the penalty at death for the kidnaping and murder. We reversed the judgment only as to penalty because of errors condemned in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]. (*People* v. *Varnum* (1964) 61 Cal.2d 425 [38 Cal.Rptr. 881, 392 P.2d 961].) Before retrial, however, we issued a writ of habeas corpus and reversed the judgment in its entirety on the ground that confessions introduced in evidence had been obtained in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]. The judgment was not final when *Escobedo* was decided. (*In re Varnum* (1965) 63 Cal.2d 629 [47 Cal.Rptr. 769, 408 P.2d 97].) On this appeal defendant does not challenge his conviction of assault with intent to rob James Fields. He challenges only his conviction of the robbery, kidnaping, and murder of Norman Merrill.

On the evening of August 16, 1962, Merrill, a service station attendant, was on duty alone. A witness saw him leave in the company of three male Negroes, one of whom was driving a customer's automobile that was regularly parked at the station. Summoned to the service station, the owner discovered that about $50 was missing from the cash register. Early the next day Merrill's wallet containing no money was found in the street about 10 miles from the station. That afternoon his body was discovered face down in a maintenance yard near the place where his wallet had been found. He had been shot twice in the back.

The transcript testimony of John Ashton Victoria, who testified at the first trial but could not be located for the second, was the most damaging evidence against defendant. At the time of the crime Victoria, a schoolboy, fry cook, and busboy, was living with Edward Jackson who was convicted with defendant at the first trial. Victoria recounted an evening meeting in Jackson's apartment where defendant and his accomplices planned the robbery. They had one gun, and a neighbor, Thomas Hanks, lent them another, a Colt, which defendant carried in the waistband of his trousers when they left the apartment. They returned about midnight. Victoria testified that defendant gave the Colt to Hanks and that the trio discussed their having killed the victim. Defendant divided the money among the three conspirators, and each gave some to Hanks for the use of his gun.

Defendant's fingerprints were found at the service station on the cardboard box in which credit receipts were kept and on the horn ring and the inside of the left front window of the car used to kidnap the victim. A ballistics expert testified that the lethal bullets had been fired by a Colt such as the one Victoria testified defendant had taken with him.

The foregoing evidence is sufficient to support the verdicts. ▇ Defendant contends, however, that the trial court erred in admitting the alleged murder weapon into evidence, on the ground that it was located as a result of interrogations conducted without the preliminary protections required by *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

Police offiers conducted a fruitless search for the gun throughout the building where the Jacksons lived. They then prevailed upon Jackson, who was in jail and had confessed, to telephone his wife, who was in the women's jail, and ask her to reveal the hiding place of the gun. Mrs. Jackson said it was in the fuse box in the hallway of the apartment building, where an officer later found it. The officers thus learned of the hiding place of the gun from both Jackson and his wife who had not been advised of their constitutional rights. The inquiry had focused on both of them, and they were not in custody merely as potential witnesses but had been handcuffed while being transported to jail and had been booked for the murder. Although Mrs. Jackson was not prosecuted for the offense, she was entitled to be advised of her rights before being subjected to police inspired and supervised questioning

by her husband while she was in custody charged with murder. The information elicited from Victoria that implicated defendant also implicated Jackson as a direct participant and indicated that his wife might have encouraged commission of the robbery.

Under these circumstances information and physical evidence secured as a result of questioning the Jacksons without warning them of their rights could not be used against them. (*People* v. *Stoner* (1967) 65 Cal.2d 595, 600 [55 Cal.Rptr. 897, 422 P.2d 585] ; *People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763-767 [44 Cal.Rptr. 313, 401 P.2d 921] ; *People* v. *Ditson* (1962) 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714].) The question remains, however, whether defendant has standing to challenge the violations of the Jacksons' rights.

In cases of searches and seizures conducted in violation of the Fourth Amendment we have held that the defendant has standing to object even when his own rights were not violated. (*People* v. *Martin* (1955) 45 Cal.2d 755, 760-761 [290 P.2d 855].) Otherwise the deterrent effect of the exclusionary rule would be seriously weakened. Defendant contends that we should apply the same rule to *Escobedo-Dorado-Miranda* violations effectively to deter unlawful police interrogations. Noncoercive questioning is not in itself unlawful, however, and the Fifth and Sixth Amendment rights protected by *Escobedo, Dorado,* and *Miranda* are violated only when evidence obtained without the required warnings and waiver is introduced against the person whose questioning produced the evidence. The basis for the warnings required by *Miranda* is the privilege against self-incrimination (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 457-470 [16 L.Ed.2d 694, 713-721, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and that privilege is not violated when the information elicited from an unwarned suspect is not used against him. (See *Murphy* v. *Waterfront Com. of New York Harbor* (1964) 378 U.S. 52, 78-79 [12 L.Ed.2d 678, 694-695, 84 S.Ct. 1594].) Similarly the right to counsel protected by *Escobedo* and *Dorado* is not infringed when the exclusion of any evidence obtained through the violation of the rules of those cases precludes any interference with the suspect's right to effective representation. (See *Massiah* v. *United States* (1964) 377 U.S. 201, 206-207 [12 L.Ed. 2d 246, 250-251, 84 S.Ct. 1199].) ▪ Unlike unreasonable searches and seizures, which always violate the Constitution, there is nothing unlawful in questioning an unwarned suspect

so long as the police refrain from physically and psychologically coercive tactics condemned by due process and do not use against the suspect any evidence obtained.[1] ▮ Accordingly, in the absence of such coercive tactics, there is no basis for excluding physical or other nonhearsay evidence acquired as a result of questioning a suspect in disregard of his Fifth and Sixth Amendment rights when such evidence is offered at the trial of another person.

▮ Defendant next contends that the trial court erred in impeaching Thomas Hanks, a witness called by the prosecution. Hanks had already been convicted and sentenced to prison for his part in the crimes, and the prosecution called him to testify that he lent the murder weapon to defendant for the purpose of the contemplated robbery. When Hanks took the stand he claimed his privilege against self-incrimination. Proceeding in the presence of the jury, the trial court brought out the fact that Hanks was no longer subject to prosecution because he had already been convicted. It therefore ordered him to answer the questions. Hanks then denied any personal involvement and any knowledge of defendant's having taken part in the crimes.

The information elicited by the trial court did not establish for this jury the facts that were the basis for Hanks' conviction. Its only effect was to impeach Hanks' testimony by showing his prior conviction of a felony. No error was committed thereby even if the court's purpose had been to impeach Hanks instead of to rule on his claim of privilege.[2] The risks of abuse that had been thought to justify the now discredited rule against a party's impeaching his own witness (see Evid. Code, §§ 785, 788, operative January 1, 1967, repealing the

---

[1] In *Massiah* v. *United States, supra,* the court was careful to point out the distinction between the legality of secret surveillance and questioning of an indicted defendant and the unconstitutionality of the use of evidence so obtained against him. "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." (377 U.S. at p. 207, 12 L.Ed.2d at p. 251.)

[2] Even though the questioning by the trial court elicited facts that may have impeached the credibility of the witness, it did not intimate that the court doubted his credibility or convey any impression to the jury as to the attitude of the court on any issue in the case. (See *People* v. *Szafcsur* (1911) 161 Cal. 636, 640 [119 P. 1083]; *People* v. *Soeder* (1906) 150 Cal. 12, 18-19 [87 P. 1016].)

rule against a party impeaching his own witness; 3 Wigmore, Evidence, § 896 et seq.) are absent when the impeachment is undertaken by the court. ██ It is entirely proper for the court to elicit the fact that a witness has been convicted as an accomplice in the crime charged. (*United States* v. *Crosby* (2d Cir. 1961) 294 F.2d 928, 948; *Wood* v. *United States* (8th Cir. 1960) 279 F.2d 359, 363; *Davenport* v. *United States* (9th Cir. 1958) 260 F.2d 591, 596; *Richards* v. *United States* (10th Cir. 1951) 193 F.2d 554, 556; *Nemec* v. *United States* (9th Cir. 1949) 178 F.2d 656, 661; see also *United States* v. *Jannsen* (7th Cir. 1964) 339 F.2d 916, 919; *United States* v. *Aronson* (2d Cir. 1963) 319 F.2d 48, 51-52; *United States* v. *Freeman* (2d Cir. 1962) 302 F.2d 347, 350, cert. den. (1963) 375 U.S. 958 [11 L.Ed.2d 316, 84 S.Ct. 448].) ██ Any impeachment in this case was incidental to the court's inquiry into Hanks' Fifth Amendment privilege, but the court would have been well advised to make that inquiry outside the presence of the jury to avoid any possibility of inadvertent prejudice. Its failure to do so, however, resulted in no error for it merely brought out impeaching evidence the jury could properly hear.[3]

██ Error committed in the penalty phase of the trial, however, requires reversal. (*People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398].) The prosecution encouraged the jury to aggravate defendant's punishment by evidence that he had committed other robberies shortly before those for which he was tried. This evidence consisted solely of the testimony of Thomas Hanks, who claimed to be defendant's accomplice in the earlier escapades. Penal Code section 1111 provides that ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated. . . .'' Although no ''conviction'' was involved at the trial on the issue of penalty, section 1111 cannot be construed to apply only to the trial on the issue of guilt, for it was enacted long before the adoption of separate trials of those issues.[4]

██ We have held that ''evidence of the earlier crime must

---

[3]Defendant contends that in its instructions on the law of accomplice responsibility the trial court in effect directed the jury to find him guilty. The court instructed that if anyone had committed the crimes charged, then Hanks, as a matter of law, was an accomplice. Because the jury already knew that Hanks had been convicted for his part in the crimes, defendant argues, the jury could only conclude that he was defendant's accomplice. The instruction, however, like the revelation of Hanks' conviction, in no way connected defendant with Hanks.

[4]Pen. Code, § 1111, was enacted in 1872. The penalty trial procedure, provided by Pen. Code, § 190.1, was not established until 1957.

meet the rules of admissibility governing proof of that crime or be otherwise properly admissible in the penalty proceeding.'' (*People* v. *Purvis* (1961) 56 Cal.2d 93, 97 [13 Cal. Rptr. 801, 362 P.2d 713]; *People* v. *Hamilton* (1963) 60 Cal. 2d 105, 129-131 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Bentley* (1962) 58 Cal.2d 458, 460-461 [24 Cal.Rptr. 685, 374 P.2d 645].) ■ Moreover, because evidence of other crimes ''may have a particularly damaging impact on the jury's determination whether the defendant should be executed . . .'' they must be proved beyond a reasonable doubt before the jury may consider them. (*People* v. *Polk* (1965) 63 Cal.2d 443, 450 [47 Cal.Rptr. 1, 406 P.2d 641]; see also *People* v. *Terry* (1964) 61 Cal.2d 137, 149 [37 Cal.Rptr. 605, 390 P.2d 381].) Accordingly, at the trial on the issue of penalty the corpus delicti of an earlier crime must be established before an uncorroborated extrajudicial confession can be admitted (*People* v. *Hamilton, supra*), and an earlier crime cannot be proved by hearsay (*People* v. *Purvis, supra*). ■ For the same reasons Penal Code section 1111, prohibiting proof of an earlier crime by the uncorroborated testimony of an accomplice, also applies at the trial on the issue of penalty.

The error in admitting the accomplice testimony was substantial, and it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (Cal. Const., art. VI, § 13■; *People* v. *Hines, supra*, 61 Cal.2d 164, 170; *People* v. *Hamilton, supra*, 60 Cal.2d 105, 137.)

The judgment is reversed insofar as it relates to penalty. In all other respects, it is affirmed.

Tobriner, J., Sullivan, J., and White, J.,† concurred.

PETERS, J.—I concur with the majority in the reversal as to penalty, but I dissent insofar as the majority affirm the balance of the judgment challenged by defendant. That too should be reversed.

At the trial there was introduced the murder weapon, a most important piece of evidence for the prosecution. This gun had been discovered by the police as a direct result of the improper interrogation of Edward Jackson and his wife, also

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

charged with the murder here involved. The majority opinion frankly admits that the interrogation of the Jacksons was at the accusatory stage—they were both in jail charged with the murder, suspicion had focused on them, and the questions were asked to elicit incriminating information against Varnum as well as the Jacksons. Admittedly, the interrogation of the Jacksons violated the rules laid down in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. There can be no doubt that had this evidence been offered against the Jacksons they could properly have objected to its admission into evidence. But, say the majority, Varnum, also charged with the murder, has no ''standing'' to challenge the invasion of the Jacksons' constitutional rights. If this holding is correct then a big hole has been blown in the barriers erected by *Escobedo*, and its progeny. The beneficent purposes intended by *Escobedo* and the more recent case of *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], have been to a great extent defeated. I am convinced that the United States Supreme Court will not and should not permit such a contraction of its purposes.

This result is reached by the majority although they admit that in the case of an unlawful search and seizure third persons have standing to urge an illegal search although their rights are not directly violated. (*People* v. *Martin*, 45 Cal.2d 755 [290 P.2d 855].) The majority assert, correctly, that the basis of this rule is that otherwise ''the deterrent effect of the exclusionary rule would be seriously weakened.'' Certainly one can say, with even greater emphasis, that the rule here adopted by the majority will seriously impair the deterrent effect on improper police activities intended by *Escobedo*. A reading of *Escobedo*, *Dorado*, and *Miranda* demonstrates that the rules there adopted were adopted largely to deter improper police activities, just as the unlawful search and seizure rules were adopted for the same purpose. The same rule should be applied to both situations.

The majority also imply that if the confession had been coerced from the Jacksons, Varnum would have standing to attack it. But what the majority overlook is that the rules adopted in *Escobedo*, *Dorado* and *Miranda* were adopted because of the fear that a confession without the required warnings is suspect as coercive. Certainly, the United States Supreme Court in *Escobedo* and *Miranda* applied the coercive confession rules. They should also be applied here.

The majority seem to think that the problem here involved differs from the unlawful search and seizure situation because the search and seizure was *ab initio* illegal, while here the original interrogation of the Jacksons was "lawful," and would become unlawful only when and if the confession or its fruits were introduced into evidence against the Jacksons. Since the confession was never introduced against the Jacksons no error was committed. Thus it is said: "Noncoercive questioning is not in itself unlawful" and again, "there is nothing unlawful in questioning unwarned suspects so long as the police refrain from physically and psychologically coercive tactics." Such "reasoning" discloses a misconception of the rules under discussion. Improper interrogation, without the requisite warnings, violated the Fifth and Sixth Amendment rights of the witness. It is "unlawful" to interrogate a suspect without giving him the required warnings from the very moment of the first question. The right of privacy recognized in *Escobedo* and *Miranda* has been violated the moment interrogation starts. The fact that the most important sanction imposed for violating that right of privacy is inadmissibility of the confession into evidence, and that the defendant cannot complain in his criminal trial unless the confession is introduced, does not make the interrogation lawful. The same can be said about an unlawful search and seizure; yet there is no doubt that the unlawful search is unlawful when committed, and not when the fruits of such search are introduced into evidence. The one thing made crystal clear by *Escobedo* and certainly by the explanation of that case in *Miranda* is that it is unlawful to interrogate without giving the required warnings.

What the sanction may be if the confession is not introduced we need not now determine. All that we have to determine is that the interrogation was unlawful. Violation of the Fourth Amendment occurs at the time of the unlawful search. Violation of the Fifth Amendment occurs the moment defendant is induced to give incriminating information. Violation of the Sixth Amendment occurs the moment the accused is interrogated without being informed of the right to counsel. What the majority fail to realize is that *Escobedo, Dorado* and *Miranda* pushed back the impact of the Fifth and Sixth Amendments from the courtroom to the police station.

Carried to its logical conclusion the rule that interrogation is not unlawful until the results of that interrogation are

introduced in evidence in a criminal trial, suggested by the majority, would mean that the privilege against self-incrimination does not exist when a witness is interrogated by a legislative committee because legislative committees are not engaged in criminal trials. I am sure the majority intended no such ridiculous result, but that would seem to be the result of their reasoning.

In support of its contention that the violation of the privilege against self-incrimination does not occur until the evidence is used against the accused the majority rely on *Murphy* v. *Waterfront Com. of New York Harbor,* 378 U.S. 52, 78-79 [12 L.Ed.2d 678, 694-695, 84 S.Ct. 1594]. That is the case that repudiated the old rule that one jurisdiction could compel a witness to testify where his testimony, although not incriminatory in that jurisdiction might incriminate him under the laws of another jurisdiction. The state had granted the witness immunity under state law, but he claimed the privilege on the ground that his testimony would incriminate him under federal law.

It was held that under its grant of immunity the state could compel the witness to testify and that the witness' privilege would be protected by precluding the federal authorities from using the testimony in a criminal prosecution against him. But this holding does not support the thesis of the majority. The court adopted the rule announced to "accommodate the interests of the State and Federal Governments in investigating" crime. Unless the state under its immunity statute could take the testimony the whole purpose of the immunity statutes would be defeated in many, if not most, situations for which they were designed. No such competing state and federal interests are here involved.

*Massiah* v. *United States,* 377 U.S. 201, 206 [12 L.Ed.2d 246, 250-251, 84 S.Ct. 1199], is also relied upon by the majority to support their conclusion that the right of the accused to counsel is not violated until the prosecuting authorities attempt to use the words elicited while the accused was without a lawyer. It is true that that case states that the accused was denied his right to counsel when the confession was introduced. But there is nothing in that opinion to indicate that there was no violation of the accused's rights if the confession is not used at trial. In *Escobedo* where the accused demanded the right to counsel the rights of the accused were violated immediately upon that request being denied.

Implicit in the holding that noncoercive questioning is lawful until the confession is introduced in a criminal trial is the concept that such noncoercive interrogation is desirable and to be encouraged. To the contrary *Escobedo, Dorado* and *Miranda* tell us in no uncertain terms that all such interrogations are to be discouraged. Insofar as we permit the fruits of an interrogation in violation of those cases to be introduced into evidence we are encouraging not deterring unlawful police activity.

The practical effects of such a holding cannot be minimized. What the majority have done is to attempt to turn a doctrine protective of constitutional rights into a rule of evidence. It must be remembered that the rule of the majority holding that interrogation without warnings is lawful not only encourages such interrogations but also encourages officers to ignore express requests for counsel and to ignore assertions of reliance on the privilege against self-incrimination. Under *Dorado* and *Miranda* the same rules are applicable to both situations. In *Miranda* the court unequivocally covered the situation under discussion in the following language. (*Miranda* v. *Arizona,* 384 U.S. 436, at pp. 473-474 [16 L.Ed.2d 694 at p. 723, 86 S.Ct. 1602, 10 A.L.R.3d 974].) "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. [Footnote omitted.] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

I interpret those words as limitations on police activity— the majority do not. A conscientious police officer must, of course, try to obtain evidence by every lawful means. Now he is impliedly told by the majority that, where there are multiple suspects, he may, without giving the required warnings and despite the suspect's request for counsel or desire to remain silent, interrogate one suspect in violation of these rights in the hope of getting admissible evidence against the other suspects. The majority opinion can be interpreted as not only condoning but in effect encouraging such violation of fundamental constitutional rights.

I would hold the admission of the gun was error, and under

the facts clearly prejudicial. I would reverse the entire judgment appealed from.

BURKE, J.—I concur in the affirmance of the judgment as to guilt but dissent from the reversal of the judgment as to penalty. In my opinion it is not reasonably probable that a result more favorable to defendant would have been reached had the asserted error relating to the testimony of Thomas Hanks not been committed. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 836-837 [299 P.2d 243].) Hanks testified that he, defendant and others committed two robberies on the street, that defendant was unarmed on both occasions, and that on neither occasion was the victim hurt. These offenses were of a minor character compared to the other crimes defendant committed, and they added little to the prosecution's case. It appears that defendant brutally killed his robbery victim, James Merrill, by shooting him twice in the back after robbing him and kidnaping him for the purpose of robbery. Defendant also committed an assault with an intent to commit robbery upon James Fields, and during the commission of that offense after Fields had fallen defendant pointed his revolver directly at Fields and pulled the trigger. In addition defendant has twice been convicted of the unlawful taking or driving of a vehicle.

Furthermore, at the penalty trial the court informed the jury that ''the general instructions having to do with credibility of witnesses and so forth [given at the guilt trial] apply to this phase of the case as well as to the other one,'' and at the guilt trial the court fully instructed the jury regarding the law relating to an accomplice's testimony. The instructions informed the jury that the testimony of an accomplice is to be viewed with distrust and that a conviction may not be had upon the testimony of an accomplice unless it is corroborated, and the instructions further defined an accomplice, stated that if the offenses involving Merrill were committed by anyone then as a matter of law Hanks was an accomplice, and explained what corroboration is sufficient. In view of these instructions and the further instruction given at the penalty trial that evidence of other crimes may not be considered as evidence unless proved beyond a reasonable doubt, it does not appear that the alleged error was prejudicial.

Under the circumstances, in my opinion the alleged error relating to Hanks' testimony did not result in a miscarriage of justice, and I would affirm the judgment in its entirety.

McComb, J., concurred.

Appellant's petition for a rehearing was denied June 28, 1967. White, J.,* sat in place of Mosk, J., who deemed himself disqualified. Peters, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.