[Crim. No. 11397.   Second Dist., Div. Two.   Apr. 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ESTHER LEONORA DONOVAN, Defendant and Appellant.

[Crim. No. 12123.   Second Dist., Div. Two.   Apr. 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL JOSEPH DONOVAN, Defendant and Appellant.

(Consolidated Cases.)

Richard A. Walton and George V. Denny III, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard Tanzer, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendants Michael and Esther Donovan appeal from the judgments entered against them following a jury trial that resulted in their conviction of the crime of possessing heroin in violation of section 11500 of the Health and Safety Code. Appellants' contentions are so numerous, despite the basic simplicity of the essential legal and factual

issues presented in the trial of this case, that it is impractical to set them forth as separate assignments of error. We shall therefore discuss and dispose of them, seriatim, following a statement of the factual background relevant to the particular issues to be considered.

For purposes of passing on appellants' objection to the introduction of evidence seized at the time of appellants' arrest, the trial court accepted as true certain facts presented by way of an offer of proof by appellants. These included an arrest by State Bureau of Narcotics' officers on October 13, 1964, of one Leslie Clendenon on a charge of uttering forged prescriptions for a narcotic. During Clendenon's examination following his arrest, the following questions and answers were reported:

"Q. Can you give me a hint as to who wrote those [prescriptions]? A. Are you going to make it any easier for me if I tell you who it is? Q. It's going to be the best way—it's going to be incorporated into a report, and any cooperation that you give—naturally, the Judge will be reasonable and is going to be reading it and will be cognizant of it. Now they will only ask us if the party cooperated, and any cooperation, naturally, we'll say so."

After two other brief questions, Clendenon stated that the prescriptions were forged by appellant Michael Donovan. The officers thereafter had the writing on the prescriptions analyzed by an expert and compared with samples of Michael's handwriting taken in connection with standard booking procedures utilized at the time of certain of his earlier arrests. The expert concluded that the materials had been written by the same person.

On the basis of this information the state narcotic officers obtained the issuance of a complaint charging Michael with violating Health and Safety Code section 11715. The state officers gave the warrant for Michael's arrest, together with the information on which it was based, to the Los Angeles police, who, also, had received information concerning appellants' trafficking in narcotics.

The Los Angeles police officers initially were unsuccessful in locating appellants. However, on the morning of October 27, 1964, at approximately 10 a.m., an untested informant advised them of appellants' residence and stated further that appellants had returned from Tijuana the preceding night where they had purchased a quantity of heroin which they were cutting and packaging for sale in their apartment.

Officers McKnight and Dorrell took up positions in a vacant apartment where they could observe the entrance to the apartment allegedly occupied by appellants. After 10 to 15 minutes of surveillance, Michael was seen to walk up to the described apartment and begin to open the door with a key. The officers then approached appellant who, upon observing them, stepped into the apartment and began shouting, "Esther, it's the heat. Esther, it's the heat. It's the heat."

Officer Dorrell followed Michael into the apartment, perhaps causing him to fall as he crowded by him in the hallway in his proper effort to prevent the destruction of evidence. Officer McKnight handcuffed Michael and then entered the apartment. In the kitchen Officer McKnight observed in plain view on the sink a can of milk sugar, plastic funnels, measuring spoons, etc., of the type ordinarily used in cutting and processing heroin for retail sale. In the bedroom Officer Dorrell found appellant Esther in bed, apparently nude beneath a sheet. He had heard that Esther had carried narcotics concealed in her vagina and the movements of her hands beneath the sheets led him to believe that this might be the reason for her actions at that moment.

In the nightstand beside the bed Officer Dorrell observed a small cardboard box containing a hypodermic syringe, 25 hypodermic needles and a small eye dropper. Esther's hands revealed evidence of recent narcotic injections and she appeared to be under the influence of narcotics. She was handed various items of clothing and allowed to dress beneath the sheet while Officer Dorrell watched her to ensure that she did not attempt to swallow any contraband that she might have removed from her privates.

When Esther had dressed she was handcuffed and placed on one of the two couches located in the front room which previously had been searched for narcotics without success. A policewoman was called to conduct a search of her person. While the officers were in appellants' apartment, a Jerry Stillinovich arrived. He was detained and after a phone call revealed that he was a parole violator he, too, was placed under arrest and handcuffed to Michael who was seated on the second front room couch.

Approximately 15 minutes after the officers' call, a policewoman arrived and escorted Esther into a bedroom. She required Esther to remove her clothing. Although the policewoman did not physically examine into Esther's body cavities, she did have her squat to determine if any objects might be expelled from her vagina or become visible therein.

Nothing was discovered during this search. However, when Esther left the couch on which she had been seated, it was reexamined by Officer McKnight. He found a plastic bag containing a condom and a finger stall, each of which, in turn, contained balloons filled with heroin. The bag was moist and the two officers and the policewoman testified that in their opinion it had an odor indicating that it had been in a woman's vaginal area.

█ Appellants initially contend that the arrest warrant was invalid because the information that ultimately led to the expert's comparison of Michael's handwriting with that found on the forged prescriptions had been obtained from Clendenon by means of a promise of leniency. This contention is without merit. First, the simple answer given by the officers to Clendenon is not such as to render his subsequent statement involuntary. (Cf. *People* v. *Hill,* 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) Secondly, even if the officers' questioning of Clendenon might possibly be construed as in any way improper under the *Miranda-Escobedo* rules, appellants may not complain of its indirect effect upon them. (*People* v. *Teale,* 70 Cal.2d 497, 506 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Kanos,* 70 Cal.2d 381, 386-387 [74 Cal.Rptr. 902, 450 P.2d 278]; *People* v. *Varnum,* 66 Cal.2d 808, 813 [59 Cal.Rptr. 108, 427 P.2d 772].)

█ Appellants next contend that they were denied due process because the warrant for Michael's arrest had been lost and, further, even if it had been obtained in accordance with California's code requirements, it would have been invalid. (*People* v. *Sesslin,* 68 Cal.2d 418, 422 et seq. [67 Cal.Rptr. 409, 439 P.2d 321].) However, such fact does not aid appellants herein since the information possessed by the state narcotic officers was unquestionably sufficient to supply probable cause for Michael's arrest regardless of whether or not such information had been supplied to the magistrate who issued the warrant. (*People* v. *Chimel,* 68 Cal.2d 436, 440 et seq. [67 Cal.Rptr. 421, 439 P.2d 333].)

We need not undertake to determine whether or not the additional information known to the Los Angeles police officers would have been sufficient alone to justify appellants' arrest since it is clear that they were acting at the request of the state officers who, as indicated, had probable cause to arrest Michael. (Cf. *People* v. *Ross,* 67 Cal.2d 64, 70 [60 Cal. Rptr. 254, 429 P.2d 606]; *People* v. *Webb,* 66 Cal.2d 107. 112 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708]; *People* v.

*Talley,* 65 Cal.2d 830, 836, fn. 2 [56 Cal.Rptr. 492, 423 P.2d 564].)

Appellants contend that the officers' true objective was to search their apartment rather than to arrest Michael for forging prescriptions. They then argue that either (1) the police lacked information sufficient to obtain the issuance of a search warrant and should not be permitted to do indirectly what they could not do directly; or (2) they had sufficient information to obtain a search warrant, and time in which to do so, and therefore the evidence obtained in the absence of such a warrant should have been excluded.

Neither of these contentions is meritorious. ■ "It is axiomatic that a search . . . incidental to a lawful arrest is valid. [Citations.]" (*People* v. *Ross, supra,* 67 Cal.2d 64, 69.) ■ In view of all the information possessed by the arresting officers, including that which had been communicated to them by the state narcotic officer, Michael's conduct at the time he observed the approach of the police as he was entering his apartment supplied ample grounds for their entry, for the arrest and for the ensuing search of the premises. The condition of Esther, as well as the various items of narcotic paraphernalia found therein, provided sufficient grounds for her arrest.

We need not consider appellants' contention that the introduction of the "illegally" obtained narcotics forced Michael to take the stand in his own defense and subject himself to cross-examination. If the evidence had been "illegally" obtained, there would be no case against appellants and the consequences of its improper receipt in evidence would be immaterial. However, the evidence was not illegally obtained nor improperly received and therefore appellants may not complain of any prejudice suffered as the result of Michael's own testimony.

■ Appellants contend that the seizure and subsequent destruction of certain of Michael's address books deprived them of due process of law. Because of the apparent extensive nature of appellants' narcotic activities, the seizure of books containing information which might lead to the arrest of other persons involved in the illegal traffic in narcotics was entirely proper. Officer Dorrell testified that he had given Michael all the information contained therein that he had requested and offered to forward the books to. him at the county jail. It was only after Michael had said "no, he didn't want the books, because he had all the information that he needed, [that] I then threw them away."

We may assume that the officer should have retained the seized items despite Michael's expressed lack of interest therein, but even such presumed error would not constitute grounds for reversal. The only indication of prejudice suffered by appellants as the result of this incident was Michael's claim that the books contained the phone number of a person known to him only as "Steve" who would have testified that he had talked with Michael for several minutes outside the apartment building before Michael had entered the premises and approached the door of his own apartment. The trial court, whose exclusive duty it was to determine all questions relating to the legality of Michael's arrest and the search incident thereto, properly determined that such testimony, even if in complete accord with appellants' offer of proof, would not have affected its rulings in the matter.

Appellants next complain of the trial court's decision to call or recall as its own witnesses the policewoman who had participated in appellants' arrest, Jerry Stillinovich, a clerk of the court that had issued the warrant for Michael's arrest, and the two police officers who had participated therein. Appellants assert that the court in so proceeding assumed the role of the prosecution in order to ensure their conviction. The record does not support this contention.

The fact that the prosecution was willing to rest its case without calling these witnesses following the presentation of appellants' defense certainly does not indicate that the court anticipated that such witnesses would strengthen the case for the prosecution. On the contrary, the hiatuses existing in the record, and noted by the trial court, might well have resulted in the necessity for the jury to draw inferences favorable to the prosecution. The further testimony of these witnesses designed to eliminate the need for such speculations could well have redounded to appellants' benefit. The right and duty of a trial judge to call and examine witnesses cannot be seriously questioned. (Cf. Evid. Code, § 775; *People* v. *Corrigan*, 48 Cal.2d 551, 555 et seq. [310 P.2d 953].) As stated in *People* v. *Bowman*, 240 Cal.App.2d 358, 382 [49 Cal.Rptr. 772]: " 'The duty of a trial judge, particularly in criminal cases, is more than that of an umpire; and though his power to examine the witnesses should be exercised with discretion and in such a way as not to prejudice the rights of the prosecution or the accused, still he is not compelled to sit quietly by and see one wrongfully acquitted or unjustly punished when a few questions asked from the bench might

elicit the truth. It is his primary duty to see that justice is done both to the accused and to the people. He is, moreover, in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench.' [Citations.] ''

There is nothing in the present record to indicate that the court's actions in any way were intended to, or did, create an impression in the minds of the jurors that the court had thrown its weight on the side of the prosecution. The court's actions were entirely in accord with its expressed purpose, i.e.: ''The Court had not the slightest idea how these witnesses were going to testify, but the Court felt there was a hiatus in this trial. This Court has often called witnesses which both parties are afraid to call or for some other reason do not call, and the only reason I call a witness, as you say, is to ascertain the truth, and very often the witness who nobody else has called sets the defendant free. I am only attempting to discover the truth, and that is all. The chips fall where they may.''

As subsidiary aspects of this basic contention appellants argue that the court abused its discretion in regard to controlling the order of proof and in making remarks allegedly critical of appellants' counsel. We find no merit whatsoever in either of these arguments. The first is refuted by our above observations relating to the propriety of the trial court's efforts to fill in the evidentiary gaps remaining at the time both sides initially rested.

The second is not supported by the record. Of course, it is doubtless true that every defendant would prefer that there be no interference with the tactical maneuvers of his counsel but he has no standing to complain when the court limits them to their proper bounds. Appellants' evident aim throughout the trial was to plant in the minds of the jurors, by innuendo and indirection, the thought that perhaps the narcotics found on the premises had been brought there by Jerry Stillinovich.

Appellants had called Stillinovich to testify in their behalf on the issue of probable cause. The question whether or not he had brought narcotics onto the premises was irrelevant to this issue and he was not questioned directly on this point. Nevertheless, the questions that were asked of him were designed to produce answers so potentially incriminating that he doubtless could have refused to answer them on Fifth Amendment grounds. However, appellants did not suggest such possibility

to the court or to him nor did they request the court to admonish him as to his constitutional rights.

However, when the prosecution took Stillinovich as its own witness in rebuttal, after he had been called by the court, and sought to question him on this basic point, appellants' counsel immediately insisted that he be advised that he could still refuse to answer this single pivotal question. Although perhaps the court might well have ruled that Stillinovich had waived his right by his prior testimony, to appellants' obvious satisfaction, it sustained his refusal to answer this one fundamental question. The court's observation that appellants' solicitude for Stillinovich's constitutional rights was rather belated was neither false nor improper.

Subsequently, as counsel for appellants well knew, the court would instruct the jury that they were not to draw any inferences as to appellants' guilt or innocence from Stillinovich's refusal to testify (CALJIC No. 55). Nevertheless, they sought to argue before the jury that since the prosecution could have requested that Stillinovich be granted immunity (Pen. Code, § 1324), the jury could and should be able to deduce what his testimony would have been from the fact that no such request was made.

In sustaining an objection to this clearly improper line of argument, the court made clear to the jury that while either side could call a witness, only the court could determine which questions he might be required to answer, and, further, that while the prosecution could request that immunity be granted a witness, it was under no compulsion so to do. We perceive no error either in the court's ruling or in its explanation to the jury on this point.

In this same vein appellants also object to the questioning in the presence of the jury of the clerk of the court which issued the challenged complaint and warrant on the ground that the subject matter related solely to the issue of the legality of Michael's arrest rather than the merits of the action. This may be true but the few technical questions asked of this witness were patently harmless to appellants' defense.

Similarly, the court might well have questioned Officer McKnight as to his lack of participation in an earlier July arrest of Michael out of the presence of the jury since such examination related primarily to the admissibility of certain evidence, i.e., whether or not Michael should be permitted to introduce testimony concerning alleged mistreatment which he claimed to have suffered at the hands of other police

officers on that prior occasion. However, no prejudice resulted from this short causerie and the court properly ruled that any evidence relating to this prior incident was essentially irrelevant to the issues presented by the present case. Even if we were to assume that the court's ruling in this regard was erroneous, we would hold that in the light of the entire record it is beyond reasonable doubt that no miscarriage of justice occurred herein. (Cal. Const., art. XI, § 13.)

■ Appellants next contend that the court erred in refusing to declare a mistrial by reason of a certain answer given by Officer McKnight during an examination concerning his actions after Esther had been removed from the front room to be searched by the policewoman. The following is reported:

"Q. What did you do? A. I searched the sofa where Esther Donovan had been seated. Q. Had you not already searched that? A. I did. Q. Why did you search it again? A. *Because I had received information that she had narcotics upon her.* MR. WALTON [counsel for Esther] : This is the rankest kind of hearsay, very prejudicial. THE COURT: Overruled. MR. WALTON : Probable cause cannot come in before the jury for the very reason that we are trying to avoid, your Honor. It calls for all sorts of hearsay, evidence which is inadmissible on the case on its merits, and I feel that we should be entitled to take this issue up outside the presence of the jury." (Italics added.) Subsequently, the court ordered the officer's italicized answer stricken but denied appellants' motion for a mistrial. Such ruling was entirely proper.

Initially, it may be noted that the question, "Why did you search it again?" was not asked in connection with any issue relating to "probable cause." Probable cause for the search of the premises had long since been established outside the presence of the jury and the officers needed no further justification for reexamining the couch upon which Esther had been seated. Furthermore, the *motive* of the officer in again searching the couch must have been self-evident to the jury although irrelevant as to his *right* so to do.

Secondarily, it may be noted the answer given by the officer, though potentially founded on inadmissible hearsay, did not necessarily relate to any matter not already revealed to the jury. That is to say, Officer Dorrell testified that by reason of his observations of the movements of Esther's hands beneath the sheets, he had concluded she might be in possession of narcotics and that *he had communicated this information to*

*Officer McKnight.* Of course, appellants' counsel also knew by reason of their *voir dire* examination of the officers on the issue of probable cause that the officers had been advised of the possible concealment of narcotics within Esther's privates prior to the events in question. However, the jury was wholly unaware of this fact and nothing in the officer's answer tended to disclose such information to the jury. The motion for a mistrial was properly denied.

■ Lastly, appellants contend that the court erred in sustaining an objection to a question apparently designed as a prelude to an offer to present demonstrative evidence to the jury. That is to say, appellants' offer of proof, made at the time the court ruled on the challenged question, and their argument in their brief filed herein, indicates that it was their desire to have one of the police officers demonstrate how restricted are the movements of a person whose arms have been handcuffed behind his back.

■ "The admission of demonstrative evidence must be regulated by the sound discretion of the court. It is only in cases of a clear abuse of this discretion that an appellate court will interfere. Hence a refusal by the court to allow a witness to illustrate his testimony by reference to a model violates no legal right." (18 Cal.Jur.2d, Evidence, § 204, p. 677.)

■ We find no abuse of discretion in the instant case.

The officers had testified that Esther's hands were handcuffed behind her while she was seated on the couch. It is self-evident that the movements and reach of her hands would be severely limited and a demonstration was not required to establish this fact. Appellants could, and did, argue with great vigor the proposition that a woman so restrained would be physically unable to remove an article from her vaginal area. We need not decide why the jury rejected this argument. Perhaps they believed Esther had expelled the contraband without using her hands, as the policewoman testified sometimes occurred spontaneously when a suspect was forced to squat, or they may have believed that Esther had removed the contraband from her vagina and concealed it in her clothing as she dressed beneath the sheets prior to the time she was handcuffed. It is even possible, though unlikely, that the jury concluded that the contraband had escaped detection during the initial search of the couch although it had been present throughout. It is sufficient to hold that we find nothing physically impossible in the jury's resolution of this issue and no

abuse of the trial court's discretion in sustaining the objection to the question designed to introduce a demonstration.

The judgment is affirmed. `

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing in No. 12123 was denied May 20, 1969, and appellant's petition for a hearing in No. 12123 by the Supreme Court was denied June 25, 1969.